[Civ. No. 460. Third Appellate District.—April 25, 1908.]

## LUCY A. BARRY, Respondent, v. R. H. BEAMER and JOHN M. DAY, as Trustees Under Will of GEORGE J. GAREY, Deceased, and KATIE GAREY and LULU BARKER (*nee* LULU GAREY), Appellants.

PAROL CONTRACT TO MAKE WILL—ENFORCEMENT IN EQUITY.—Equity will enforce a parol contract to make a will in favor of the plaintiff, where the plaintiff, in reliance upon the contract, has changed her condition and relations so that a refusal of the promisor to carry out the agreement will operate as a fraud upon her.

ID.—ENFORCEMENT AGAINST CLAIMANTS UNDER DECEASED PROMISOR—TRUST.—The contract is enforced against those claiming under the deceased promisor, not by ordering a will to be made in favor of the plaintiff, but by regarding the property in the hands of the heirs, devisees, assignees or representatives of the deceased promisor as impressed with a trust in favor of the plaintiff, and compelling such a disposition of the property as will carry out the intent of the agreement.

ID.—SUFFICIENCY OF EVIDENCE—RULE OF EQUITY—CERTAINTY AND JUSTICE OF CONTRACT.—*Held*, upon a review of the evidence, that, notwithstanding the rule that a court of equity should scrutinize evidence of an oral contract to make a will with particular care, and that it should be enforced only upon a satisfactory showing that it is definite, certain and just, the evidence is sufficient to prove the contract alleged, and shows an adequate consideration that the contract is just and reasonable as to the parties against whom it is to be enforced—that is, certain and definite, and involves no invasion of the legal or equitable rights of innocent third parties.

ID.—PROVINCE OF TRIAL COURT—FINDINGS NOT DISTURBED.—It was within the province of the trial court to determine all questions of fact, and the truth or falsity of the testimony, and whether the evidence was sufficient to make a satisfactory showing that the agreement was definite, certain and just; and this court cannot interfere with its findings where it cannot be said, as matter of law, from the evidence in the record, that the contrary is true.

ID.—ULTIMATE AND PROBATIVE FACTS—SUPPORT OF FINDINGS.—It is sufficient that the findings of ultimate facts upon which the enforcement of the contract depends are sustained by the evidence; and it is immaterial whether probative facts unnecessarily found are not warranted by the evidence.

APPEAL from a judgment of the Superior Court of Lassen County, and from an order denying a new trial. F. A. Kelley, Judge.

The facts are stated in the opinion of the court.

Clark & Anderson, for Appellants.

N. J. Barry, for Respondent.

HART, J.—The object of this action is to secure the specific enforcement of an alleged oral agreement entered into by and between George J. Garey, in his lifetime, and the plaintiff, by which, it is claimed, the first named agreed to will all his property to the plaintiff herein.

The court gave plaintiff judgment. Thereafter, a motion for a new trial was made and the same denied by the court. From the order denying said motion this appeal is taken.

The complaint alleges that the plaintiff and George J. Garey were brother and sister; that in the month of October, 1900, the plaintiff, who was then about seventy-three years of age, was, and had been for some years, a resident of Marysville, and at that time owned a small farm near that city, making her own living from the products of said farm; that she was living alone, and that, at the time we are speaking of, she was visited by her brother, George J. Garey, who was a bachelor, aged about sixty-three years, residing at Ash valley, in Lassen county, where he was engaged in the business of raising cattle and where he owned considerable property, both real and personal; that Garey was then in ill-health and declared to the plaintiff that "he was living in a very rough and comfortless manner" in Lassen county, and that he "was dependent entirely upon hired help for assistance in his said business of farming and raising cattle, and was dependent upon such persons as he could hire to keep house for him and to give him the comforts of life, and was, a great portion of the time, compelled to live among men without such comforts as may be acquired through the assistance and society of women, and was compelled to do his own cooking, washing and mending, and general housekeeping; that he was growing old and had not a great while to live, and that he greatly desired

in his declining years to have some one of his own blood near him to give to his old age the comforts of a home, to care for him in his sickness, to do his general housekeeping, to see to the cooking of his food, his washing and mending, and particularly to give to him that love and affection due from a sister to a brother''; that at the time mentioned said Garey agreed with the plaintiff that if she would lease her property near Marysville until such time as the same could be sold, and in the meantime go with him to his home in Ash valley, there to remain with him as long as he or she lived, and would take charge and care of the general housekeeping duties for him, and look after and minister to his wants and necessities in sickness, and would allow him to take the money derived from the leasing and sale of her said property, to be used by him in his said business, that he would support and care for her as long as he or she lived without any expense to her, and that he would make a will and thereby give, devise and bequeath to her, absolutely for herself, all of the property of every kind or nature which he might own at the time of his death; that plaintiff agreed to this proposition, leased her said property and went to the home of Garey, remaining there and acting as his general housekeeper and otherwise taking care of him until the time of his death, on the thirtieth day of October, 1905; that plaintiff, in accordance with said agreement, gave and turned over to said Garey all moneys she received under the lease and also the money realized from the sale of her property, of which she subsequently disposed by a sale, and that Garey used the same in his business. It further appears from the complaint that, upon the death of Garey, a last will and testament executed by him in Yolo county on the fourth day of February, 1904, was found and presented to the probate court for probate, and that by the terms of said will all his property was devised and bequeathed to the trustees, herein named as defendants, to be held by them ''for the abundant support and maintenance of my sister,'' the plaintiff herein, with the remainder, if anything remained, of the ₑestate after her death, to his ''two nieces, Katie Garey and Lulu Garey, daughters of my deceased brother, M. J. Garey.''

The answer denies all of the allegations of the complaint, and alleges that Garey had supported and maintained plain-

tiff for many years prior to the time that she went to his home; that plaintiff did not at any time derive sufficient means from the products of her farm near Marysville from which she could support herself; that said farm was of little value, was subject to overflow, was strongly impregnated with alkali, and was, consequently, very unproductive, and that it frequently happened that such crops as she planted did not grow or mature. It is further alleged that, in consequence of the poverty of plaintiff and her inability to properly support herself, Garey had advanced to and loaned her money, and that, finally, on account of her extreme old age and growing helplessness, and out of compassion for her, and believing that he could the better care for her, and render to her the succor necessary in her helpless condition, he invited her to come to his home in Lassen county to live with him; that she went to his home under the circumstances thus indicated, and that Garey "continued to care for her as he had in the past, looking out for her wants and comforts." The answer also alleges that, at the time of the death of Garey, the plaintiff was and "is now indebted to his estate in an amount in excess of any claim made by the said Lucy A. Barry in said complaint."

The contention of the appellants is that the evidence is insufficient to sustain the essential and important findings of the court. The complaint urged by appellants that, among its findings, the court found certain *probative* facts to be true without evidence to justify such findings, appears to be well founded. But we think that, notwithstanding that fact, the court's findings of the *ultimate* fact derive sufficient support from the evidence. It is manifestly unnecessary to make findings of the probative facts, or, in other words, of the evidence introduced for the purpose of proving the ultimate fact or the fact in dispute; but such findings will not vitiate the findings of the ultimate fact, if the evidence is of sufficient strength to support them. And, it may be stated, that the rule is that even where probative facts only are found, yet if the ultimate fact flows as a necessary conclusion therefrom, the findings are sufficient. (*Emmal* v. *Webb*, 36 Cal. 197; *Riddell* v. *Brizzolara,* 56 Cal. 381; *Packard* v. *Johnson,* 57 Cal. 183; *Bull* v. *Bray,* 89 Cal. 286, [26 Pac. 873].) Therefore, it follows that if the evidence as shown by the record justifies the findings that the agreement as pleaded, and for the enforce-

ment of which this suit was instituted, was made and entered into by and between the deceased and the plaintiff, and that the latter performed her part thereof, then the ultimate fact is established by the findings, upon which, under the law, the judgment rests in perfect security, assuming the contract as proved is one enforceable in equity, although some of the probative facts found by the court may not be warranted by the proofs.

The court, as we have seen, found that said agreement was made by the deceased and plaintiff; that the plaintiff carried out and performed her part thereof; that the deceased violated the terms of the agreement by failing to devise, by his last will and testament, all the property of which he died seised absolutely to the plaintiff; that, on the contrary, he gave, by will, all his property, except a life estate therein granted to plaintiff, to two nieces, and, as a conclusion of law, found that the plaintiff was entitled to a specific performance of said agreement.

The only questions in the case, then, are: 1. Does the evidence support the findings? 2. Is the agreement as pleaded and as found by the court to have been made, one which a court of equity may and ought to enforce?

These questions may be answered by an examination of the evidence as presented and the equitable principles which recognize contracts of the nature of the one here alleged, resting, as this does, entirely in parol, and which sustain the enforcement of the terms thereof.

The evidence addressed to the merits of the controversy and received by the court on behalf of the plaintiff is undisputed, so far as any attempt to impeach or contradict it by the defendants appears from the record, except such effort as was made to do so by the cross-examination of plaintiff's witnesses.

The testimony of the plaintiff shows that the transaction involving the making of the agreement occurred under the circumstances, substantially, as alleged in the complaint; that the deceased, who had for many years been living the life of a bachelor on his Lassen county ranch, having and enjoying none of the ordinary comforts of a home, had visited the plaintiff at her residence near Marysville in October, 1900, and then and there importuned her to dispose of her possessions,

turn over the money realized therefrom to him, to be used in his business, and to go to his home, live with and take care of him, and to exercise a general supervisory control over his household affairs; that he promised her that if she would do as he thus requested and desired, he would give to her, by will, all the property of which he was the owner at the time of his death, if she outlived him, provided, further, that in the event that she should die first, then whatever property she might have she would give to him; that she accepted the proposition thus made by her brother, first leased her farm, consisting of one hundred and sixty acres, and turned over to him the money received as the rent therefor, and thereafter sold said farm, and, after paying off some debts, gave to Garey the balance; that she went to Garey's Lassen county farm and there remained, from the year 1900 until his death in the month of October, 1905; that during all that time she managed and superintended his home affairs, by cooking, washing, mending his clothes, and generally doing all the service ordinarily incident to the duties of a housewife; that she took care of Garey when he was ill, at all times treated him tenderly and affectionately, and gave him home comforts, to which he had previously been unaccustomed on said farm. The plaintiff testified that she had always made a comfortable livelihood on her own farm by raising grain, vegetables, chickens and turkeys; that she often employed two or three men to assist her in sowing and gathering her crops and vegetables, and in disposing of the products of her farm; that she was always surrounded by circumstances of comfort, and was comfortably situated at the time her brother made the agreement which is the subject of this action by which she was induced to leave and finally dispose of her own home and go to his and there permanently reside. She further testified that she took with her to her brother's home all her furniture and bed and bedding; that she took, among other things, some feather beds, a luxury theretofore unknown to what some of the witnesses characterized as Garey's "buckaroo" camp, referring to the Lassen county home of the deceased.

The witness Ellery, who was once the foreman on the plaintiff's farm near Marysville, corroborated the plaintiff with regard to the character of said farm and its capabilities as a producer and the ability of plaintiff to thereby make a com-

fortable living. George Templeton also testified that he was acquainted with the farm of Mrs. Barry near Marysville; that he was there in 1900, and that the farm consisted of "good land," and the plaintiff then had "plenty of stock, horses, turkeys and chickens and grain; that she was then making a comfortable living," etc.

J. G. Conklin testified to conversations had with the deceased after the plaintiff came to his ranch; that deceased had told him that the plaintiff "had put her money in with his and he was going to live like a white man, and if he died first it would all be hers, and if she died first it would be his." He further said that Mrs. Barry had attended to all the housekeeping for Garey after her arrival at his farm; that Garey "drank a great deal of liquor and was in poor health."

Mrs. Alice Dibble stated that she knew Garey for many years prior to his death, and also knew the plaintiff; that she visited Garey's house many times before plaintiff went there; that Garey "did not live very nice. He did his own cooking and he didn't wash at all, I think. He had no women there to do anything and they got along the best they could by 'batching'; sometimes they had good food and sometimes they didn't, and sometimes the men would cook and sometimes Mr. Garey would cook. After Mrs. Barry came up she kept his bed clean and his dishes clean, did the cooking and got on pretty well. She was a pretty good cook. I was there in August, the year he died. She took care of him. She treated him kindly. She kept things clean and was good to him. She was patient with him. She gave him his medicine if any one gave it to him. . . . She did lots of things, everything she could do. She made his bed, ironed, bathed his feet and person, combed his hair, gave him a glass of milk if he wanted it and did anything she could for a dying man. He was dying at that time. I know she did his washing and mending. I had a conversation with George Garey regarding his business, in August last year. He told me he had Aunt Lucy well provided for. He said he had willed her everything."

Mrs. Lou Templeton corroborated Mrs. Dibble relative to the conditions existing on Garey's farm before the arrival there of plaintiff, and also as to the comforts by which deceased was surrounded through the ministrations of plaintiff after she took charge of the domestic affairs of the deceased.

She also testified that Garey was very "cross" and hard to
please; that he slept in a sort of "dog's nest" before Mrs.
Barry went to his ranch, and that after plaintiff took control
of his home affairs he was given a comfortable home and was
well taken care of. This witness also testified that she knew
that plaintiff on one occasion gave Garey $500, and on an-
other the sum of $1,017.60. On one occasion the deceased said
to her after plaintiff went to his farm that "he was living
like a white man, that Mrs. Barry was taking care of him, that
it was lots different than I used to be, that he was pleased
with her, that she was doing all she could and that he was
happy now." This witness further testified: "I remember
Mrs. Barry signing a note with George Garey to the bank of
Alturas and that he called Aunt Lucy in and told her to put
her name down. He remarked, 'That makes the estate pay
it.' That was all I heard about the note."

The witness George Templeton, to some of whose testimony
we have before referred, stated that plaintiff had general
supervision of the housework during all the years she lived
with Garey; that for five years prior to his death Garey
"complained all the time," and that for three of said five
years, "he was very bad," referring to his physical condi-
tion. "He had," continued this witness, "pains in his back
and we had to rub him with pain balm. His habits with
reference to sobriety were not very good. He was always
cross when he was on one of his drunks. He was hard to get
along with. Mrs. Barry always took care of him. . . . He
told me Mrs. Barry gave him $500, that he got $1,000 of
Mrs. Barry at one time and at another time he said he got
$500. I remember one time that George gave a note to the
bank of Alturas. I signed it and Mrs. Barry also signed it
with George. At that time he said to Lucy, 'I guess you'd
better sign this too, and in case anything should happen to
me the estate would have to pay it.' "

The foregoing embraces, we think, a fair synopsis of all
the testimony brought out through the examination in chief
of all the witnesses whose evidence has any bearing on the
merits of the case. As we have declared, no effort was made
to contradict the facts elicited from plaintiff's witnesses, ex-
cept through the cross-examination of said witnesses. We
think the evidence presented by the record before us is un-

doubtedly sufficient to establish the making of the agreement as pleaded. There are, it is quite true, what appear to be some inconsistencies and contradictions disclosed by cross-examination in the testimony of the plaintiff's witnesses. There seems to be much force in the criticism by counsel of the testimony of the plaintiff herself, where she declares that, at the time she borrowed something over $1,800 and executed a mortgage on her farm to secure the payment of the same, she then had in her possession the sum of $900 in coin which she had accumulated and saved from the earnings of her farm. And counsel call attention to discrepancies in the testimony of other witnesses for the plaintiff. Many of these, from the bare record, might appear to be sufficient to discredit the entire testimony of such witnesses. Yet, since the trial judge, in whose presence these witnesses testified, and who had the opportunity, not given to reviewing courts, of seeing and hearing the witnesses, of judging of their intelligence, of observing any physical or mental infirmities with which they might then have been afflicted, of viewing the circumstances under which, by cross-examination, the seeming inconsistencies were made to appear, and, in short, of applying all the tests by which the credibility of witnesses and the weight of their testimony may, at least to moral accuracy, be determined, has seen fit to accept the declarations of the witnesses directed to the proof of the making of the pleaded agreement, we do not see how a reviewing court would be justified in saying that such testimony should be entirely disregarded. The plaintiff positively testified that she had as much as $900 when she borrowed the amount, to secure which she gave a mortgage on her farm; she could not tell whether the $900 was in gold or silver, but declared repeatedly that she in fact had that sum then. It would seem to be almost incredible that one having in her possession such a large sum of money could not tell whether it was in gold or silver. But the trial judge, for some reason, seems not to have regarded the declaration as particularly significant. The plaintiff testified that at the time of the trial—May, 1906—she was seventy-nine years of age, and it is probably true that the trial judge, in his analysis of her cross-examination, considered this fact in determining the credit and weight to which, under the circumstances, her testimony was entitled.

But, as we have said, this court is not required to weigh the testimony or reconcile discrepancies therein. If the evidence as disclosed by the record is such that it cannot be said, as a question of law, to be insufficient to support the findings, then we are powerless to interfere with said findings.

That the agreement is one which, having been proved, should be enforced, there can be no doubt, it seems to us.

The evidence shows that the nearest relation by consanguinity to the deceased was the plaintiff. He had for many years lived in a state of celibacy on a cattle ranch situated in an isolated section of the mountainous regions of the state—a life unaccompanied by the tender attentions which constitute home comforts in their fullest sense. His sole companions were "buckaroos" (vaqueros), or men presumably without culture or refinement, engaged in the business of herding and "rodeoing" cattle.

As he grew older, naturally life to him under such circumstances became irksome and wearisome, and with his advancing years he, naturally, the more and more yearned for the companionship and the tender care of the one who, of all living persons, could the more completely and satisfactorily fill the long-existent hiatus in an unhappy and then rapidly waning life. He earnestly and, it may be, pleadingly besought his only sister to dispose of her own home—a home where she had spent many of the years of her life in comfortable circumstances, and valued by her not more perhaps because of its intrinsic worth than because to her it was hallowed by pleasant memories and fond associations—and come to him, situated as he was, that he might be given the care and attention which he could, under the circumstances, only derive through the love and affection of a sister. She not alone complied with his request to live with and take care of him, but turned over to him all her means to be used in his business. The evidence shows, that while he was a man of ample means, he nevertheless practically lived, prior to the arrival of his sister at his home, in squalor and misery. His habits for sobriety were not good, according to the testimony. He slept, as one of the witnesses declared, in a "dog's nest," by which it is to be understood that the bed upon which he slept was no better, for comfort and cleanliness, than that ordinarily occupied by that animal. She changed all this.

8 Cal. App.—14

She rescued him from a life of uncleanliness and misery, and gave him comforts to which he had been unused, and when his last illness attacked him, she tenderly and affectionately cared for him, and thus minimized the sufferings of the last, expiring hours of his life. For five years, he declared, and well could he do so, "he had lived like a white man."

Is there any possible money compensation equal to the service thus rendered and the sacrifices thus made by this sister? Could the plaintiff, under the circumstances disclosed by the record, be placed in *statu quo* by any known legal remedy? Why should not equity enforce such a contract as is shown here? The evidence shows an adequate consideration; that the contract is just and reasonable as to the parties against whom it is sought to be enforced; there is no showing, nor an attempt at showing, that the plaintiff practiced fraud or undue influence in securing the contract; that it is certain and definite, not within the statute of frauds, and its enforcement will not involve the invasion of the legal or equitable rights of an innocent third party. (Civ. Code, sec. 3391; *Stewart* v. *Smith,* 6 Cal. App. 152, [91 Pac. 667].)

Professor Pomeroy, in his work on Specific Performance, page 268, states the principle upon which such agreements as the one here are enforced, in the following language: "Courts of equity will, under special circumstances, enforce a contract to make a will, or to make a certain testamentary disposition, and this may be done, even when the agreement was parol, *where in reliance upon the contract the promisee has changed his condition and relations so that a refusal to complete the agreement would be a fraud upon him.* (Italics ours.) The relief is granted, not by ordering a will to be made, but by regarding the property in the hands of the heirs, devisees, assignees, or representatives of the deceased promisor, as impressed with a trust in favor of the plaintiff, and by compelling defendant, who must of course belong to some one of these classes of persons, to make such a disposition of the property as will carry out the intent of the agreement."

The principle thus stated has been applied in many cases in California and other jurisdictions.

One of the leading California cases upon the subject is *McCabe* v. *Healy,* 138 Cal. 81, [70 Pac. 1008]. Healy, who was for many years engaged in the stock-raising business on an

extensive scale in one of our northern counties, after acquiring considerable wealth, visited his native country, Ireland. There he met McCabe, then a boy of fourteen years of age, to whom he became attached. He importuned the boy's mother, who was his sister, to allow the boy to return with him to this country, agreeing to educate the lad, train him in the business in which he was engaged, and if, upon learning the business, the boy would properly look after the same, he (Healy) would, upon his death, leave him all his property. The "plaintiff, his mother, and his guardian accepted this proposition made by Healy, and upon the strength of these promises, plaintiff was given into the possession of Healy, brought by him from Ireland to Lassen county, California, and for seventeen years these two people lived together, keeping faith to the full letter and spirit of the aforesaid understanding." Healy died intestate, and McCabe brought suit to enforce the agreement made by Healy. Sustaining the decree of the trial court enforcing the performance of the terms of said agreement, the supreme court, among other things, says: "The facts of this case, when tested by the law as the court finds it, demand the relief given by the chancellor's decree. . . . Appellants, in their brief, have cited no case where relief has been denied upon facts in any substantial degree similar to those here presented, and it is doubtful if there is such a case to be found in the law books. It is not plain to the understanding what additional element in the nature of further covenants between Healy, upon the one part, and the boy, his guardian, and his mother, upon the other part, could have been inserted into this contract which would have given it greater legal strength." A significant distinction between that case and the one at bar, and favorable to the latter, is to be observed in the fact that in the former there must have been, under the terms of the agreement and in the very nature of the situation, a considerable period during which the promisee could perform no actual service, while in this case the plaintiff immediately proceeded to render the service she agreed to perform and to carry out other covenants of the agreement which she promised to execute.

"It is the settled doctrine of this court," says Chief Justice Beatty, in *Bell* v. *Wyman*, 147 Cal. 515, [82 Pac. 41], "that a man may bind himself by a contract, written or oral,

to make a particular disposition of his property by will, and that such contract may be specifically enforced in favor of the promisee.''

In the late case of *Stewart* v. *Smith*, 6 Cal. App. 152, [91 Pac. 667], this court, in an opinion by Mr. Justice Burnett, elaborately discusses this principle. In that opinion will be found, in addition to an interesting discussion of the proposition, a long line of authorities cited, in which the principle is exhaustively considered.

But there is no need of pursuing the subject, for it is a firmly settled proposition—so elementary that it requires no discussion—that a man may dispose of his own property at his pleasure and in any manner which may best suit his own judgment, and, as is said in the leading case of *Johnson* v. *Hubbell*, 10 N. J. Eq. 332, [66 Am. Dec. 776] : ''No good reason can be assigned why he may not make a legal agreement to dispose of his property to a particular individual, or for a particular purpose as well by will as by a conveyance to be made at some specific future period, or upon the happening of some future event. It may be unwise for a man in this way to embarrass himself as to the final disposition of his property, but he is the disposer by law of his own fortune, and the sole and best judge as to the time and manner of disposing of it. A court of equity will decree the specific performance of such an agreement upon the recognized principles by which it is governed in the exercise of this branch of its jurisdiction.''

There is not to be found, in this case, the element present in the case of *Owen* v. *McNally*, 113 Cal. 444, [45 Pac. 710], which furnished the very strongest reason for denying the specific performance of an agreement similar in terms to the one here. The rights of innocent third parties have not intervened here to justify the refusal by a court of equity, upon that ground, to award the relief asked for. After McNally had made the agreement with the plaintiff, he married, and the court, in an opinion by Mr. Justice Henshaw, says that a contract such as this, if so construed as to be in restraint of marriage, would be void, and that, therefore, ''the only permissible conclusion is that the parties contracted in contemplation of that event. Upon its happening, the rights of innocent third parties intervened and a decree

of specific performance could not be awarded"; citing *Gall* v. *Gall,* 64 Hun, 600, [19 N. Y. Supp. 332].

Counsel, for appellants have cited many authorities which they claim sustain their several contentions, but we think an examination of them will show, upon the facts, a marked distinction between them and the case here.

It is earnestly and correctly argued that a contract such as this, whose existence and terms must depend for their establishment upon the uncertainty of the memory of witnesses, should be, when sought to be enforced by a court of equity, "scrutinized with particular care," and that "only upon a satisfactory showing that it is definite and certain and just, will it be enforced." (*Owens* v. *McNally,* 113 Cal. 444, [45 Pac. 710].) That a court of equity should thus be particular and cautious in the enforcement of such agreements, is a proposition which cannot be gainsaid. And we assume, as we are bound to do, that the court to which the evidence was addressed and which must determine the question of the truth or falsity of all the testimony and settle and reconcile to its own satisfaction any discrepancies in such testimony, if any appear, or whether the memory of any particular witness, or that of all of them, may or may not be depended upon, has exercised the particular care required in such cases, and has concluded that a satisfactory showing was made that the agreement here is definite and certain and just. To us, as a reviewing court, the agreement, from the evidence presented, appears to be so, and, as we have endeavored to make clear in another part of this opinion, we would not be warranted in declaring that it is *not* definite and certain and just, unless the record evidence is such as to support us in so declaring as a question of law. This, we say, we are not justified in doing in this case.

It is hardly necessary to refer to authorities upon this point. They are numerous in this as well as in every other state in the Union. But the language used by our supreme court in discussing this question in *Brison* v. *Brison,* 90 Cal. 324, [27 Pac. 189], is so pertinent to the case at bar that we quote: "It may be conceded, as is claimed by the appellant, that the evidence of a verbal agreement between husband and wife, that will create a constructive trust, should be clear, satisfactory and conclusive; but it must also be conceded that

whether the evidence in any case is of this character, must be determined by the trial court, and this court must accept the determination of the trial court thereon as conclusive.'' And again, in *Wadleigh* v. *Phelps,* 149 Cal. 627, [87 Pac. 93], it is said: ''. . . This question of fact, like all other questions of fact, is one for the trial court. All questions as to preponderance and conflict of evidence are for the trial court. To the extent that its determination rests upon the mere preponderance of evidence, or upon the consideration of conflicting or contradictory evidence, the findings of the trial court are not open to review in this court.'' (See, also, *Schultz* v. *Schultz,* 159 Ill. 654, [50 Am. St. Rep. 188, 43 N. E. 800]; *Steinmeyer* v. *Seibert,* 190 Pa. 471, [70 Am. St. Rep. 641, 42 Atl. 880]; *Elliott* v. *Whitmore,* 23 Utah, 342, [90 Am. St. Rep. 700, 65 Pac. 70]; *Shahan* v. *Swan,* 48 Ohio St. 25, [29 Am. St. Rep. 517, 26 N. E. 222].)

There is, as before observed, no contradictory evidence in the case at bar upon the vital points involved. The discrepancies, or, rather, apparent inconsistencies, shown by the cross-examination of plaintiff and of some of her witnesses constitute alone the foundation for the claim that the evidence is contradictory and that the pleaded agreement was not proved.

We can see no reason for disturbing the findings and thus the decree of the court below, and discover no prejudicial errors in the court's rulings.

The order is, therefore, affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 24, 1908.