[Civ. No. 8946.   Second Appellate District, Division One.—March 18, 1935.]

K. L. CARVER, Appellant, v. ANNA FITZSIMMONS, as Administratrix, etc., Respondent.

Harry J. McClean for Appellant.

Joseph Scott and Theodore C. Heyl for Respondent.

SHINN, J., *pro tem.*—Plaintiff appeals from a judgment of nonsuit in an action brought on a claim against the Estate of Fitzsimmons, which claim arose out of the following transaction:

On March 11, 1931, plaintiff advanced to Fitzsimmons the sum of $25,000 under written agreement which provided that the money should be used to acquire the capital stock of a corporation to be organized in the state of Oregon for the purpose of installing and operating a chain of grocery stores in the states of Oregon and Washington. The agreement provided that Fitzsimmons would cause a corporation to be organized with a capital of 5,000 shares of stock without par value; that $25,000 would be paid to the corporation in return for 2,050 shares, of which 50 shares were to go to employees and the remainder to Carver, one-half thereof to belong to him and one-half to be held subject to the right of Fitzsimmons to acquire the same in the following manner: that for each $2,500 earned by the corporation and set aside as surplus, Fitzsimmons should have the right to delivery of 100 shares of the stock held by Carter until he had acquired 1,000 shares by reason of the fact that the surplus of the corporation had reached a total of $25,000, whereupon Carver and Fitzsimmons would each own 1,000 shares of

stock. It was also agreed that the contracting parties would use their best efforts to see that the corporation earned and declared specified quarterly dividends, and that neither of the parties should be paid any salary or other compensation for services until the surplus of the corporation amounted to $25,000. The agreement provided as follows:

"It is the intent and purpose of the parties hereto that the management and control of said corporation be in the hands of second party and that second party operate, manage and control the business of the corporation to the best interests of both parties hereto, . . . "; and further provided as follows: "If on April 1st, 1932, the profit and loss statement of the corporation shall not disclose net earnings for the previous six months' period equal to at least two (2) quarterly dividends as hereinbefore provided, or if, during any succeeding six months' period said profit and loss statement shall not disclose earnings equal to two (2) such quarterly dividends, it is agreed that the business of said corporation shall be liquidated as soon as practicable, unless the parties hereto mutually consent to the continuance thereof. If said corporation shall liquidate its business within three (3) years from date hereof and first party shall not have realized an amount equal to the principal sum invested by him, plus interest thereon at the rate of 7% per annum from October 1st, 1931, to the date of receipt by him of his proportion, on final distribution, of the assets of said corporation, second party shall bear and pay to first party one-half the difference between said principal sum invested ($25,000), plus interest thereon as aforesaid, and the aggregate amount which first party shall receive from said corporation in the form of dividends, or upon liquidation."

Upon receipt of the money, Fitzsimmons proceeded to Portland, where he caused the corporation to be organized and stock to be issued as agreed, he becoming president of the corporation. He thereupon selected locations for stores and entered into five leases, one in Portland and four in Seattle and West Seattle, in which locations stores were opened. The first store was opened May 2, 1931, and the others shortly thereafter. Fitzsimmons died May 12, 1931. The stores were operated by the corporation until the early part of the following year when they were liquidated, and in

this operation the entire capital was lost with the exception of $548.15. The claim upon which this action is founded arises out of the provision of the contract heretofore quoted by which Fitzsimmons agreed to indemnify Carver to the extent of one-half of the losses sustained by the latter upon liquidation of the business. After proof of the foregoing facts, the trial court granted defendant's motion for a nonsuit, placing the ruling upon the ground that the contract was one calling for the personal services of Fitzsimmons, the obligations of which were terminated by his death.

This ruling presents the only assignment of error upon this appeal. In approaching this question, it is necessary to refer to certain of the circumstances surrounding the making of the contract and which are proper to consider in reaching a true construction of the provisions above quoted.

Both of the contracting parties lived in Los Angeles. Fitzsimmons for some fifteen years had been either an employee, vice-president or other officer of the Atlantic and Pacific Tea Company, operating stores throughout the United States. After severing his connection with that company, he came to Los Angeles, where he opened and operated chain grocery stores. In March, 1931, he was operating thirty-five stores of his own in Los Angeles and was general manager of a company operating some 250 chain stores in the same locality, known as the Continental Stores. These stores were managed by store managers, above whom were supervisors and assistant supervisors, whose superiors were officers of the corporation. One Irving was acting in the capacity of supervisor. He accompanied Mr. Fitzsimmons on the trip north when the five stores were opened, became president of the corporation upon the death of Fitzsimmons, and thereafter had general charge of the operation of the stores. After Fitzsimmons' death, Carver sent north a representative, who theretofore had had no experience in the management or the operation of a grocery store, to represent him in the operation and ultimate liquidation of the business. Defendant as executrix of the estate of Fitzsimmons had no part either in running or winding up the business of the corporation.

The questions presented are these: was the obligation of Fitzsimmons to render services a basic and essential consideration for the contract or merely incidental thereto, and

was the obligation of Fitzsimmons to indemnify Carver independent of and severable from the other terms and provisions thereof?

If the continued service of Fitzsimmons in the management and operation of the business was the basis and foundation of the contract, the obligations he assumed were strictly personal and not binding on his estate. Such was the case in *Marvel* v. *Phillips*, 162 Mass. 399 [38 N. E. 1117, 44 Am. St. Rep. 370, 26 L. R. A. 416], relied upon by respondent. It was there held that an agreement to advance money for the purpose of obtaining letters-patent and to manage and build up a business, founded on the patent rights, involved personal undertakings requiring skill, attention and ability of a high order, and that the personal service was one of the principal things contracted for. Accordingly, it was held that the death of the promisor, rendering performance impossible, terminated the obligation to advance further sums of money and discharged the contract.

If, upon the other hand, the agreement of Fitzsimmons to render services to the corporation was not a controlling factor but was merely incidental to other features of the joint enterprise, the contract was not discharged by his death and the indemnity obligation is a charge against his estate. ■ Where the personal services promised are not essential to substantial performance of the contract and it appears that the parties intended in certain events to substitute the services of others, the several obligations will be held to be independent of each other. In such a case, disability will excuse the failure to perform the services but will not discharge the contract *in toto. Chater* v. *San Francisco Sugar Refining Co.*, 19 Cal. 220, gives a typical illustration of this rule. This case is relied upon strongly by appellant, but is not controlling here for the reason that under a contract, essentially different from the one we are considering, the court in that case held that the employment of a manager of the business created obligations that were independent of others, which were held to be enforceable notwithstanding the disability of the employee which terminated the obligation to render further services. *Janin* v. *Browne*, 59 Cal. 37, epitomizes the rules in a brief statement to the effect that the contract will be held personal

only to the extent that it clearly appears from its language that it was intended that one of the parties should have the benefit of the personal services of the other. The law on the subject has been clearly defined from the time of the early English cases to the effect that if one agrees to pay for personal services he is entitled to receive the exact thing he bargains for. He does not have to accept a substitute even though what is offered in substitution may be generally regarded as better than the original. The difficulty comes in the application of the law to specific cases wherein it becomes necessary for the court to take the viewpoints of the contracting parties and to determine what the exact bargain was. We experience no such difficulty, however, under the facts of this case, for it appears with certainty that both. Carver and Fitzsimmons entered upon their mutual obligations with the distinct understanding that the one was buying and the other selling the personal services of Fitzsimmons. He was to manage, operate and control the corporation—a most comprehensive undertaking. He brought to this task a wealth of knowledge and experience in a highly specialized and essentially modern method of selling merchandise. His abilities were exceptional and were undoubtedly so recognized by Carver. The argument that the services were of such a nature that they could have been as well performed by assistants or by a personal representative is not only unconvincing but unsound. Carver had a right to receive the particular services he contracted for, namely, the judgment, industry and fidelity of Fitzsimmons, which were fully as unique and incapable of duplication as are the services of artists, writers or physicians. ■ But the question of the degree of skill or ability of the person employed is important not in determining whether the services can be duplicated but in determining whether in a given case the promise to render personal service lies at the base of the contract. If it does, the contract ends with the termination of the services, because of death or disability, regardless of the fact that like services might be continued by another possessed of equal or even greater ability. ■ The contract recites the fact that Fitzsimmons is possessed of ''considerable experience in the organization, operation, and management of retail grocery stores''. Even without such a recital the court would necessarily take

such facts into consideration in construing the contract. It cannot be doubted that Carver was influenced to engage in the venture by reason of the fact that his investment would be under the continued management of Fitzsimmons. It was contemplated that the latter would manage the business in the event it was successful for not less than three years, for the parties fixed that period of time as the duration of Fitzsimmons' agreement to reimburse Carver to the extent of one-half of the losses sustained on the original investment. If, instead of making the investment in one sum, Carver had agreed to advance the money at different times, as separate stores were opened, he would clearly have had the right upon the death of Fitzsimmons to decline to make further advancements since he no longer could have the advantage of Fitzsimmons' judgment in the selection of the cities and the particular locations in the cities where the stores were to be located, to say nothing of their subsequent management. The contract should not receive any different construction because all of the money was advanced at one time. The business was one to be carried on indefinitely; there was no limitation placed upon the number of stores that might eventually be operated, and there was no time fixed when the services of Fitzsimmons would be ended. It thus clearly appears that Carver was deprived of the principal thing he contracted for when the death of Fitzsimmons made further performance impossible.

What we have said shows that the personal services of Fitzsimmons were indispensable to such performance of the contract as would give Carver the full benefit of the obligations Fitzsimmons assumed. ■ Another view of the case concerns the provision of the contract by which Fitzsimmons agreed to share one-half of Carver's losses. Since he agreed to manage the business, presumably for such time as he was able to perform such duties, the agreement was to share Carver's losses which might be sustained under his own management. It may not be assumed that he would have entered into the agreement to share the losses except upon the condition that the business would be under his own management. From the viewpoint of either of the parties, the personal services of Fitzsimmons were of such controlling importance as to justify the belief that they were not only of the essence of the contract but that they furnished the

only inducement to either of the parties to engage in the venture. They were the root of the agreement, all else was incidental. Such being the case, the several obligations of the parties were not independent; they were all undertaken in contemplation of a continuance of Fitzsimmons' services.

In such a case the rule is that there will be read into the contract an implied agreement that all obligations were to be terminated in the event the death or disability of Fitzsimmons rendered it impossible to carry into effect the purposes the venture was designed to accomplish. When the obligation to continue those services expired, the entire contract was discharged.

Plaintiff's case, consisting of proof of the foregoing facts, failed to establish a cause of action against defendant as executrix of the estate of Fitzsimmons. The judgment of nonsuit was proper and is therefore affirmed.

Houser, Acting P. J., and York, J., concurred.