[Civ. No. 20083. First Dist., Div. Two. Mar. 15, 1963.]

THEODORE MUTZ, Plaintiff and Respondent, v. HENDER-
SON R. WALLACE, as Executor, etc., Defendant and
Appellant; JAMES S. MELLEN, Intervener and Appel-
lant.

Ropers, Majeski & Kane and Robert F. Kane for Intervener and Appellant.

Otto A. Hoecker for Defendant and Appellant.

Shirley, Saroyan, Cartwright & Peterson, S. M. Saroyan and Jay R. Martin for Plaintiff and Respondent.

KAUFMAN, P. J.—This is an appeal from a judgment for the plaintiff, Theodore Mutz, granting specific performance of a contract of the decedent, Marshall S. Hanrahan, to will to Mutz $10,000 and certain real property. Appellant, H. R. Wallace, is the executor of the will of the decedent; appellant and intervener, J. S. Mellen, is an heir of the decedent and the testamentary devisee of the real property in question.

A brief chronology of the facts is necessary for an understanding of the issues presented by this appeal. For many years, the respondent Mutz, a national of Canada, was domiciled in British Columbia where he and his wife owned a resort. From time to time, the respondent undertook various jobs to supplement his income from the resort property, including government employment as a crewman on a ferry boat in recent years. As a ferryman, he received a salary

of $250 per month, plus room and board, as well as pension and retirement benefits. Respondent and his wife had several adult children whom they visited during extended periods of their winter vacation. One of these children lived in the peninsula area near Palo Alto.

In October 1949, while on such an extended visit to Palo Alto, respondent wished to supplement his income and was referred to the decedent. Respondent worked for the decedent for several months until May 1950, when he and his wife returned to their occupations in British Columbia. Respondent was not again employed by the decedent for many years, but there was a continued but infrequent personal contact. During subsequent vacations, respondent visited the decedent at his home. On other occasions, Christmas cards were sent. The initial casual employment generated personal fondness between the two men. The decedent had very limited contact with relatives and personal friends as his interests and occupations in life were limited to the use of liquor, various casual female companions, and participation in the race track activities, as he owned a racing stable. The decedent's habits were unorthodox: he ate little and irregularly, his drinking began in the latter part of the morning and progressed through the afternoons spent at race tracks and evenings at various establishments. All witnesses agreed that the decedent's mind was quite clear through the midday, but by late evening, he would reach a state when he was almost helpless, both mentally and physically; yet, in spite of these aberrations, the decedent was a man of forceful character and one whose word and commitments were sincere and subject to trust.

Late in 1957, during a vacation, the respondent and his wife made a social call on the decedent. They were shocked at the appearance and surroundings of the decedent whose latest marriage had ended. The decedent was living alone in a large home in dire condition; his health had declined through illness complicated by liquor to the point where he was unable to care for his personal needs or to drive an automobile. He was at the mercy of employed assistance. He had an old family retainer as a gardener but had been unsuccessful in keeping any reliable employees to care for him, his home, or to drive his automobile.

The respondent upon finding the decedent in the condition described was shocked and distressed by his apparent needs. Although respondent and his wife had planned to visit

friends in Los Angeles, after the decedent's repeated requests, they agreed to stay and resume their former employment for the remainder of their vacation. Although respondent worked on the average of 12-16 hours a day, no salary was agreed upon in advance and only a rather nominal compensation, in addition to room and board, was paid at the end of the temporary employment. Respondent and his wife had relied upon a tacit understanding with decedent that he would appropriately compensate them. Although the decedent was a man of means, the respondent and his wife were apparently satisfied, as the compelling consideration was not financial remuneration but was a humane interest. The record is replete with the description of menial and unpleasant tasks performed for the decedent during this period of employment.

During this period of temporary employment, the decedent repeatedly urged the respondent and his wife to remain permanently in their combined capacities as chauffeur, male secretary, valet, practical nurse and housekeeper. Respondent told the decedent that such a move would imply a total uprooting of his and his wife's situation in British Columbia. The decedent always replied that they would never regret such a move and that their future economic welfare would be provided for. When the respondent and his wife returned to British Columbia after Christmas as planned, they had made no commitment to the decedent and had not promised to return. In Canada, they again resumed their usual occupations, Mrs. Mutz at their resort, and Mr. Mutz at his job on the ferry.

The decedent telephoned them frequently urging them to return. Finally in February 1958 respondent resigned from his job and went alone to California where he reundertook his former occupation in looking after the decedent. There was no definite agreement for remuneration. As the weeks went by, respondent did, however, urge upon the decedent that they should formalize whatever understanding they were to have. During this period, respondent and his wife consummated the sale of their British Columbia property. In April 1958 respondent made one trip back to British Columbia concerning this sale while the decedent attended the Kentucky Derby. Apparently, some element of disagreement arose between the husband and wife concerning the propriety of the sale price, but the sale was completed at the end of April 1958.

Respondent's duties and responsibilities towards the de-

cedent lasted 24 hours a day and apart from taking care of the house and dog, preparing meals, etc., included chaperoning the decedent at his daily visits to the race track and numerous bars. The respondent also accompanied the decedent to various racing seasons in southern California and performed the same services. On March 4, 1958, the decedent had a stroke requiring hospitalization and thereafter became incoherent in public. He suffered numerous additional strokes requiring the use of oxygen but continued his attendance at various race tracks, etc.

The discussion concerning the employment of respondent and his wife and the remuneration thereof crystallized at conferences participated in by the decedent, his longtime counsel, the appellant Wallace, and the respondent. As a result of those conferences, Mr. Wallace drafted an employment agreement which contained provision for the employment of both Mr. and Mrs. Mutz. That agreement was executed on July 8, 1958, by all parties. Its practical effect, however, was short lived because Mrs. Mutz soon came into collision with a female associate of the decedent who, during the summer of 1958, was the social and drinking companion of decedent and lived in his home. The respondent's wife felt that the situation was unbearable and refused to continue any longer in the household. The decedent asked the respondent to remain on the same basis as before and respondent felt compelled to do so. A serious rift between the respondent and his wife developed as a result of their differing feelings concerning their obligation toward the decedent.

Thereafter, Mr. Wallace was requested to, and did, prepare another employment agreement relating only to the respondent. This latter agreement, dated August 20, 1958, is the one in question here. It is similar in substance and form to the earlier agreement except that it relates only to the respondent. The pertinent provisions provide for a monthly salary as compensation for specified domestic services and as further consideration and as an additional compensation for the continuance of Mr. Mutz' duties during the remaining years of decedent's life, provision was made that the decedent would by his last will and testament leave respondent the sum of $10,000 plus the residence and household furnishings located in Del Mar, California, or that if that house had been sold, then in the alternative a certain unimproved lot in Del Mar. There was evidence that the Del Mar lot, although unimproved, had an equivalent or greater value than the house.

The agreement further provided that it might be terminated

by either party upon 30 days' notice in writing and in such event or in the event of a dismissal of the employment with or without notice, all obligations of the decedent, except for the payment of $300 monthly remuneration, would terminate. The agreement also stated that the decedent might at any time revoke, amend or otherwise alter the provision of his will to delete therefrom the proposed devise and bequests to Mr. Mutz. As part of the same paragraph and sentence followed a provision that in the event of failure of the decedent with or without cause to make the required provisions in his will or in the event that having made them, he should rescind or revoke them, Mr. Mutz would be entitled to an additional $100 per calendar month for each month commencing June 1, 1958, until the termination of such employment by reason of the death of the decedent.

In the final paragraph, the decedent agreed that should he at any time while Mr. Mutz was in his employ reduce or void the provisions of the will relating to him, he would then notify Mr. Mutz of the change.

This agreement as finally executed by the parties had deleted from it that portion of the sentence and paragraph relating to the additional $100 per month, leaving only that portion of the sentence and paragraph granting to decedent the right to revoke the testamentary provisions with no detriment to him except the need for giving subsequent notice to the respondent.

As to the deleted portions of the paragraph, Mr. Wallace testified that he had received a long distance telephone call from decedent inquiring why that provision was in the agreement and stating that he didn't want under any circumstances to pay Mr. Mutz more than $300 per month compensation. Mr. Wallace testified that he felt that the decedent was a little foggy at the time of his conversation which took place in the morning and that he tried to explain to decedent that the provision was only included in the agreement to take effect in lieu of the testamentary provision. Mr. Wallace testified that he did not feel from his conversation that his ideas were being understood by the decedent.

Respondent testified that he and the decedent read the agreement over on the day of its execution; that the two men found the agreement in order and in accord with their understanding, except that the decedent said: "I can't understand why Mr. Wallace put this [referring to the stricken

provision] in here because you certainly wouldn't give up the house and lot for a hundred dollars a month or what was put in there." Respondent replied: "Well, let's cross it out, because if we sent it back, it will probably be weeks before we get another one back. And I suppose it will be in order just to cross these out, and I will initial it, and you will initial it. And we'll send it back." The decedent then proceeded to do so. The agreement with the deletion was before the court below.

More or less contemporaneously with the preparation of the agreement in question, the decedent ordered Mr. Wallace to prepare a codicil to his will. The codicil contained the provisions for Mr. Mutz coinciding with the proposed testamentary provisions in the agreement, as well as other provisions relating to a former wife of the decedent. The latter provisions raised tax implications. Mr. Wallace testified that when he forwarded the codicil to the decedent at about the same time as the agreement, his letter suggested that the decedent would perhaps prefer not to execute the codicil until Mr. Wallace had been able to work out an agreement with the attorney for the former wife so as to eliminate the tax problems. The codicil was not executed by the decedent prior to his death in September 1958, as the decedent had not received any advice from Mr. Wallace to the effect that the above mentioned problems had been solved.

The decedent's failure to execute the codicil or some similar provision gave rise to this litigation. Appellant Wallace, as the executor of the will, rejected the respondent's claim as a creditor. Thereafter, appellant Mellen intervened.

After a hearing before the court which produced over 900 pages of record, the trial court found that on August 20, 1958, respondent and the decedent duly executed an employment contract and agreement in writing; that at the time of execution, the decedent possessed sufficient mental capacity to understand the nature of his acts, the extent and character of his property and his relationship to the persons who were the natural objects of his bounty; that the agreement was fair and reasonable and no undue influence whatsoever was present and no innocent third party was prejudiced by the execution of said contract; that at all times prior to executing said agreement, the decedent had the advantage of advice and consultation with his personal attorney for many years, who prepared the agreement prior to the deletions made by decedent and respondent on its face.

The court further found that after the execution of the agreement and until the death of the decedent, respondent did render all services to the decedent described in the agreement and did in all particulars perform every undertaking and covenant in said contract and agreement by him provided to be performed. In reliance upon said agreement and upon the previous promises and representations of said decedent, respondent substantially altered his position in that he disposed of his residence in the province of British Columbia, resigned from his position of employment with the government of said province, gave up his civil service status as well as other vacation and retirement benefits, and moved to California in order to reside with said decedent and otherwise perform the provisions of said agreement.

The court also found that the services rendered by the respondent were of such an exceptional, extraordinary, distasteful and peculiar nature that they were not and in the contemplation of the parties were not to be compensated for other than as stated in the agreement. The decedent realized that it was impossible to estimate the value of the services and that these services were highly unusual and out of the ordinary.

The court further found that both respondent and decedent had an abiding confidence in each other and believed that an intention once expressed would not be revoked. Respondent was content to receive the promise to execute a will or codicil in his favor, feeling sure in his knowledge of the character of the decedent and their past relationship one to the other that the will or codicil having once been executed would not be revoked. Such an intent was borne out by the subsequent conduct of the decedent. The decedent at no time prior to his death showed any indication or suggestion of any change of heart or intent but to leave the property referred to in said agreement to the plaintiff.

The court found that the only apparent reason for not completing the intended execution of the codicil was the delay occasioned by tax considerations involving one of the decedent's previous wives. This delay occurred not at the request of decedent but rather at the request of his attorney and in no way related to the agreement between plaintiff and decedent or its terms or conditions. The parties bargained for the physical act of drafting a will or a codicil in respondent's favor and there was nothing ambiguous or lacking in certainty about said promise to execute said will or codicil.

Decedent breached the agreement by failing to execute a will or codicil pursuant to the agreement. Accordingly, the court entered its judgment and decree granting the respondent specific performance of the agreement and denied relief to the appellants.

On this appeal from that judgment, appellants contend that the trial court erred as: (1) the contract between the decedent and Mutz was illusory, or in the alternative, if the contract was valid, then the decedent had not breached his agreement; (2) specific performance is not a proper remedy for the breach of a contract for personal services; and (3) the judgment is not supported by the evidence. There is no merit in any of these contentions.

The first contention on appeal is that the trial court erred in finding a valid contract between the decedent and the respondent, as the promise of the decedent was illusory, or in the alternative, if the contract was valid, there was no breach by the decedent. ■ As to the first part of this argument, we need only quote from the trial court's excellent and illuminating memorandum opinion on this point: "Whether the instant contract was illusory depends on what the plaintiff was bargaining for. The question can only be determined by viewing the contract in the light of the attitude and relationship of the parties toward each other; hence, the reason for the foregoing summary of the record.

"If Mr. Mutz bargained for the assured right to receive upon decedent's death the real property and cash, then the agreement is illusory because the decedent could at his whim have left it to him or not. The agreement in that sense was no promise at all. . . . If, however, . . . these two men had an abiding confidence in each other and believed that an intention once expressed would not be revoked, and if in view of such a concept, the plaintiff was bargaining for the physical act of drafting a will or a codicil in his favor, then the agreement interpreted in such a light is not illusory. The agreement clearly provided that the decedent was to do the physical act of executing a will or codicil with favorable testamentary provisions for the plaintiff, thus including the element of detriment."

The trial court on the basis of the facts here presented concluded that the written instrument of August 20, 1958, was a valid and binding bilateral contract[1] wherein the respondent promised to render certain personal services faith-

---

[1] It would also appear that the provision that the $10,000 and realty was to be devised only if the respondent remained in the employ of the

fully and efficiently throughout the natural life of the decedent and the decedent promised to pay the respondent a monthly salary and to execute a will leaving $10,000 and certain real property to the respondent. The court stated: "There is nothing ambiguous or lacking in certainty about that promise. It does not leave any option on the part of the decedent to do or not to do that act." As the trial court pointed out, the only reference that the will or codicil might not be executed is contained in the deleted portion of the agreement. ▮ The criterion for a definite promise is whether the promise is sufficiently definite to enable a court to give it exact meaning (1 Williston on Contracts (3d ed.) § 46, p. 152, § 37, p. 107).

▮ The second argument is that the agreement is void despite the respondent's full performance of his side of the bargain. Appellants cite *Sloan* v. *Stearns,* 137 Cal.App.2d 289 [290 P.2d 382] to argue that the contract could be binding only if the decedent had performed instead of the respondent. There is no merit in this argument, as it is well established in this state that the defense of want of mutuality of obligation applies only to executory contracts, not to an executed contract or a portion thereof (*J. A. Folger & Co.* v. *Williamson,* 129 Cal.App.2d 184, 187 [276 P.2d 645]; *Mason* v. *Rolando Lumber Co.,* 111 Cal.App.2d 79, 82 [243 P.2d 814]; *Stone* v. *Burke,* 110 Cal.App.2d 748, 755 [244 P.2d 51]; *Klein* v. *Farmer,* 85 Cal.App.2d 545 [194 P.2d 106]). The court pointed out in *Stone* v. *Burke, supra,* at page 756: "And, though it be conceded there was no mutuality in the first instance, or at the inception of the agreement, this condition was cured by respondent's complete or substantial performance of the contract so far as such performance lay within his power, prior to his efforts to enforce the terms of the contract. Whatever stricture may attach to the question of mutuality of obligation in the first instance, the performance by respondent prior to the commencement of this action was sufficient to create a mutuality of remedy so as to justify his seeking appropriate relief in this litigation for the alleged failure of appellants to conform with the terms of the agreement [citations]."

decedent until the latter's natural death in the agreement in the instant case could be regarded as an offer for a unilateral contract. Respondent having fulfilled his part of the contract by performance, supplied the mutuality necessary to demand specific performance (*Wilck* v. *Herbert,* 78 Cal.App.2d 392 [178 P.2d 25]; *Podesta* v. *Mehrten,* 57 Cal.App.2d 66, 74 [134 P.2d 38]; Williston *op. cit.,* § 140; *Clarey* v. *Security Portland Cement Co., Inc.,* 99 Cal.App. 783, 786 [279 P. 483]).

██ Appellants next argue that the obligation to execute the codicil in favor of the respondent did not survive the death of the decedent, citing *Carver* v. *Fitzsimmons*, 5 Cal. App.2d 320 [42 P.2d 1066]. However, we think that the trial court properly concluded that the nature of the decedent's performance was not of such a strictly personal nature. Our Supreme Court, in *Janin* v. *Browne*, 59 Cal. 37, clearly distinguished between contracts of a strictly personal nature and those where the personal representative can do all the deceased should have done in fulfilling an agreement.

More recently, the Supreme Court held that a promise by the decedent to support the respondent for life and to educate and care for the children did not involve the rendition of any personal service or depend on the continued existence of the decedent (*Howard* v. *Adams*, 16 Cal.2d 253, 258 [105 P.2d 971, 130 A.L.R. 1003]; *Guardianship of Cornaz*, 8 Cal. 2d 347, 354 [65 P.2d 784]). The cases clearly indicate that the crucial question is the intent of the parties and the record here fully supports the trial court's findings on that issue.

We think that *Estate of Turner*, 171 Cal.App.2d 591 [341 P.2d 376] is helpful. In that case, the decedent entered into a contract with the Veterans' Administration to leave all of his property that was not "disposed of by will or otherwise" to the Post Fund upon his death, in exchange for medical care to be provided him by the Veterans' Administration. There were no restrictions on the decedent's right to dispose of his property at any time before his death. The Veterans' Administration provided the medical care pursuant to the agreement until the death of the decedent. The State of California, claiming the decedent's property had escheated, argued, like the appellants here, that the promise of the decedent was illusory and the contract void for lack of mutuality.

In rejecting these contentions, the court said at pages 596 and 597: "It is appellant's position, however, that 'the so-called agreement created no obligation on the part of the decedent and was, therefore, a *nudum pactum*, an illusory agreement.' While it is certainly true that during his lifetime Mr. Turner could dispose of his property in any manner he so desired or could have provided for its disposition by will, the important fact remains that he did not do so. There can be no doubt that the decedent received consideration in the form of care and treatment which was sufficient to

support any agreement or undertaking on his part. Under the facts of this case, appellant's present position is untenable; the fact that the decedent reserved to himself various options or 'outs' which would operate to defeat the respondent's rights does not mean that the agreement undertaken by the decedent need not be performed at all when in fact he did not utilize such options and knowingly received the consideration tendered by the respondent.''

We note also that the decedent's power of revocation in the instrument was exercisable only on notice to the respondent. Thus, the decedent did not have an unlimited power of revocation and the general rule cited by the appellants is not applicable here. It is well established in this state that if a power of arbitrary termination is exercisable only upon notice, the requirement of notice is a sufficient legal detriment to constitute consideration and hence an enforceable obligation (*Phalanx Air Freight, Inc.* v. *National etc. Freight Corp.,* 104 Cal.App.2d 771, 773 [232 P.2d 510]; *Brawley* v. *Crosby etc. Foundation, Inc.,* 73 Cal.App.2d 103 [166 P.2d 392]; *County of Alameda* v. *Ross,* 32 Cal.App.2d 135 [89 P.2d 460]; *Thomas* v. *Anthony,* 30 Cal.App. 217 [157 P. 823]).

Furthermore, a lack of mutuality is tantamount to want of consideration and where, as in this case, sufficient consideration is otherwise present, mutuality is not essential. It becomes essential only when its absence would leave a party without a valid or available consideration for his promise (*Brawley* v. *Crosby etc. Foundation, Inc., supra*; *Arrow Flying Service* v. *Universal etc. School,* 99 Cal.App.2d 49, 51 [221 P.2d 231]).

We turn now to the appellants' contention that the remedy granted by the trial, namely, specific performance, was not proper or possible under the circumstances. Appellants first contend that a contract for personal services cannot be specifically enforced. This is not the law. For example, in *Monarco* v. *Lo Greco,* 35 Cal.2d 621 [220 P.2d 737], in reliance upon oral promises from his mother and stepfather that they would devise certain realty to him, the 18-year old son gave up an opportunity for further education or any chance to accumulate property of his own and devoted his life to making a family venture a success. The court said at page 626: ''It is settled that neither the remedy of an action at law for damages for breach of contract nor the quasi-contractual remedy for the value of services rendered

is adequate for the breach of a contract to leave property by will in exchange for services of a peculiar nature involving the assumption or continuation of a close family relationship.''

In *DeHermosillo* v. *Morales,* 146 Cal.App.2d 819 [304 P.2d 854], the plaintiff, in return for her aunt's promise to devise all her realty, acted as her aunt's housekeeper, practical nurse, maid, cook, laundress, etc. for several years. The court pointed out that the services rendered by the plaintiff were of such an exceptional, extraordinary and peculiar character that they could not, and in the contemplation of the parties, were not to be compensated for in money. In *Walker* v. *Calloway,* 99 Cal.App.2d 675 [222 P.2d 455], the decedent was suffering from terminal cancer and asked the plaintiff to give up her residence in Michigan and come to Los Angeles to take care of him, upon orally promising to leave his entire estate to her. The court said at page 680: ''Where the services rendered by plaintiff consisted in nursing and caring for a person enfeebled and suffering from a horrible disease, requiring constant and unceasing watchfulness, harrowing to the mind, destructive to the peace and comfort of the one performing the services, and possibly injurious to the health, it has been held that it is impossible to estimate their value by any pecuniary standard; and where it is evident that decedent did not intend so to measure them, it is out of the power of any court, after the performance of such services, to restore the plaintiff to the situation in which he was before the contract was made or to compensate him therefor in damages.''

Similarly, the services here rendered were of an unusual and exceptional character. The record is replete with instances of the many onerous tasks performed daily by the respondent for the decedent (see also *Barry* v. *Beamer,* 8 Cal. App. 200 [96 P. 373]; *Fowler* v. *Hansen,* 48 Cal.App.2d 518 [120 P.2d 161]). Thus,. the court properly found that the respondent seriously changed his position because of his arrangements with the decedent. The respondent not only uprooted himself from Canada but suffered a possible jeopardy to his domestic situation.

Furthermore, it is well settled that where, as in the instant case, a claimant has been induced to abandon his home, his employment and friends and adjust to a new pattern of life by a decedent's promise to devise property in exchange for personal services, his legal remedies are inadequate and specific performance is a proper remedy (*Jones* v. *Clark,*

19 Cal.2d 156 [119 P.2d 731]; *Davis* v. *Jacoby*, 1 Cal.2d 370 [34 P.2d 1026]; *Wolf* v. *Donahue*, 206 Cal. 213 [273 P. 547].) We think the trial court properly concluded that the peculiar fact situation of the instant case brought it within the above rules.

We turn finally to the contention that the evidence does not support the findings. As said in *Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367 [210 P.2d 757] at p. 370: "André Gide once observed: 'Everything has been said already; but as no one listens, we must always begin again.' With rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. No one seems to listen. We are satisfied from an examination of the voluminous transcript that the findings are amply supported by the evidence."

Judgment affirmed.

Shoemaker, J., and Agee, J., concurred.