[Civ. No. 21648.    Second Dist., Div. Three.    Dec. 14, 1956.]

BLANCA M. DeHERMOSILLO, Respondent, v. AUGUSTIN F. MORALES, as Administrator, etc. et al., Appellants.

Leonard DiMiceli for Appellants.

David A. Fall and Kenneth W. Gale for Respondent.

WOOD (Parker), J.—Action for "quasi-specific performance" of oral agreements to make a will devising property as compensation for services rendered, and to establish a trust in the property. Augustin Morales, as administrator of the estate of decedent, is a defendant. Also he is a defendant, as sole beneficiary of the estate. Judgment was for plaintiff. Defendants appeal from the judgment, and from the order denying their motion for a new trial.

Appellants contend, among other things, that the first amended complaint does not state a cause of action; the two alleged agreements are invalid under the statute of frauds; plaintiff had an adequate remedy at law; and no oral agreement was proved.

The amended complaint alleges that Maria M. Acosta, a resident of Los Angeles County, died intestate about May 8, 1953; defendant Morales is administrator of her estate; about October 1, 1949, decedent Mrs. Acosta was ill and unable to care for herself; she requested help from plaintiff, "who was the much loved niece and cherished friend of decedent"; about October 6, 1949, plaintiff and decedent entered into an oral contract to the effect that if plaintiff would act as decedent's housekeeper and practical nurse, take care of decedent during her illness, and look after decedent's comfort and general welfare, decedent would, upon her death, leave a will devising to plaintiff all property owned by decedent at the time of her death; plaintiff accepted and performed all of the terms of said contract; about April 29, 1950, decedent and her husband Crispin Acosta, purchased two houses located on a lot in San Pedro, California; the houses were at 207 South Centre Street and 311 West Second Street; subsequent to such purchase, about May 1, 1950, decedent entered into an oral contract with plaintiff (referred to as supplementary contract) whereby decedent agreed that if plaintiff would continue to "carry out" the contract of October 6, decedent would leave a will devising to plaintiff the house located at 207 South Centre Street and the portion of the lot upon which said house was situated; plaintiff accepted and performed all of the terms of the supplementary contract; Mr. Acosta died about March 7, 1952, at which time Mrs. Acosta became owner of the property; Mrs. Acosta did not will or convey any of the property to plaintiff or to any other person; plaintiff put aside many of her personal pleasures, comforts, and affairs, and forsook many of her friends while she cared for decedent; in accepting and carrying out the terms of the agreement, the plaintiff changed her position and altered her life, "all in detrimental reliance upon the aforesaid promises and agreements made by the decedent" that she would make a will providing for the plaintiff as aforesaid; pursuant to the contract of October 6, plaintiff made a home for decedent and performed the contract until December 13, 1952; from October 6, 1949, until about December 13, 1952, plaintiff "kept house for said deceased, acted as maid, laundress, cook, practical nurse and looked after the comfort and general welfare, and gave her love, companionship, affection and solace during the decedent's remaining days."; decedent moved to the home of Augustin Morales (defendant) about December 13, 1952; decedent died at the home of Morales on May 8,

1953; plaintiff remained ready, able and willing, between December 13, 1952, and May 8, 1953, to carry out the contracts between plaintiff and decedent but was prevented from doing so by the moving of decedent to the home of Morales; about December 13, 1952, decedent's financial difficulties prevented her from maintaining a home, and by reason thereof she waived the full performance by plaintiff of the contracts until such time as plaintiff could obtain employment and arrange for a housekeeper to care for decedent during the hours plaintiff was working; plaintiff found employment, and had made arrangements about May 6, 1953 (two days before decedent's death), for a housekeeper to look after decedent; decedent and Mr. Acosta, purchased the property with community funds; Mr. Acosta was present when the oral contracts were made; he orally agreed to the terms of the contracts and agreed that if plaintiff would perform the contracts the survivor of them (Mr. and Mrs. Acosta) would make a will devising the property to plaintiff; decedent's estate was solvent; a considerable portion of the property would remain for distribution after payment of debts and the costs of administration; plaintiff had performed the agreements and changed her position in detrimental reliance upon the promises of decedent; plaintiff performed services of exceptional and extraordinary character and rendered comfort and solace to the decedent in an amount which could not be estimated in money; plaintiff had no adequate remedy at law for breach of the agreement, and defendants are estopped to assert the invalidity of the agreement, as such an assertion would be a fraud upon the plaintiff; by reason of the premises herein, Mrs. Acosta held the property in trust for plaintiff; decedent left no husband, children or issue of children surviving her; defendant Morales is the next of kin of decedent, and except for said contract he would be entitled to the estate; the claim of Morales is subsequent to the claim of plaintiff under the contract.

The prayer of the amended complaint was for a decree establishing the original and supplementary contract between plaintiff and Mrs. Acosta as alleged by plaintiff; and decreeing that plaintiff is entitled to specific performance of the contract; and decreeing that defendant Morales is constructive trustee of "the proceeds of the contract and the supplemental contract" for the benefit of plaintiff.

Defendant Morales demurred to the amended complaint upon the grounds that it failed to state a cause of action in that the alleged cause of action appeared to be barred under

the provisions of section 1973, subdivision 6, of the Code of Civil Procedure and section 1624, subdivision 6, of the Civil Code. The demurrer was overruled.

The second amended answer set forth as an affirmative defense that the agreement alleged was not in writing and was by its terms not to be performed during the lifetime of Mrs. Acosta; that plantiff had an adequate remedy at law; that on October 13, 1953, plaintiff filed a claim against the estate of Mrs. Acosta, and a copy of the claim was attached to said answer; that plaintiff was notified in writing of the rejection of her claim. The claim of plaintiff (as shown by the copy attached to the answer) was for $4,200 for services as "Maid, housekeeper, laundress and practical nurse for Maria M. Acosta at $100.00 per month" from June 10, 1949, to December 13, 1952. The copy of the claim shows that the claim was rejected on October 15, 1953.

It was stipulated that Mrs. Acosta died intestate; plaintiff had filed a claim against her estate; the claim was disallowed; the property known as 207 South Centre Street and 311 West Second Street was the entire estate of Mrs. Acosta and it was appraised at $6,000.

When plaintiff was called as a witness, defendant objected to any testimony on the grounds that the complaint failed to state a cause of action; plaintiff had an adequate remedy at law; plaintiff had exercised that remedy by filing a claim against the estate and the claim was disallowed. The objection was overruled.

Plaintiff testified that in 1934, when plaintiff was 17 years of age, she went to live with her aunt, Mrs. Acosta, and she stayed there until 1941, when she (plaintiff) moved to Mexico; she married in Mexico; she conducted an English-Spanish academy in Mexico and taught English and Spanish; her net income from the academy was from 900 to 1,100 pesos a month (from $185 to $225 a month); she continued to work there until she returned to the United States in 1949; she received letters in Mexico from Mrs. Acosta and from her (Mrs. Acosta's) neighbors; plaintiff lost the letters; Mrs. Acosta stated in every letter than she was ill, she needed plaintiff, wanted plaintiff to come and be with her, she did not want anyone else to take care of her for the reason plaintiff used to live with them (Mr. and Mrs. Acosta) and she knew them very well and they loved her as their own daughter. Plaintiff testified further that she returned to San Pedro in March, 1949, intending to make a short visit with Mr.

and Mrs. Acosta and then return to Mexico; she had a conversation with her aunt that caused her to remain here; she did not remember the exact words of the conversation but that her aunt wanted her to remain—her aunt felt that she was getting older and sicker and she did not feel that she had long to live, and that she wanted plaintiff to remain here and see her through her last days; her aunt was 61 years of age at that time; Mr. Acosta was always present when she had conversations with Mrs. Acosta, and his statements were the same as Mrs. Acosta's statements—he always wanted plaintiff to stay; Mr. and Mrs. Acosta promised plaintiff that if she would stay that everything they had would be given to her, because they could not afford to pay plaintiff and that was their way of showing their appreciation of her; Mr. and Mrs. Acosta then lived at 311 West Second Street in San Pedro; subsequent to that promise plaintiff agreed to the terms of the promise and took care of Mrs. Acosta; plaintiff brought her husband from Mexico in May, 1949, and then they went to live with Mr. and Mrs. Acosta; in October, 1949, there was a subsequent promise in respect to leaving property to plaintiff on death; plaintiff had expressed a wish to return to Mexico; Mr. and Mrs. Acosta begged her not to go; they stated that she should heed what they asked her to do, they wanted her here, they had no one else to turn to, they loved her as their own daughter, they felt that it was her duty and she should not leave; in consideration of that promise, she remained and took care of them.

Plaintiff testified further that in October, 1949, Mr. and Mrs. Acosta purchased the property located at 311 West Second Street and 207 South Centre Street; thereafter there were other conversations as to what would happen on the death of Mr. and Mrs. Acosta; the conversations were "in this line" that "if I [plaintiff] kept my promise to them, that if they should ever pass away I [plaintiff] was to have the corner house—that is, 207 South Centre"; Mr. and Mrs. Acosta "stated always they would write up a paper, which to them was a will," leaving 207 South Centre Street to plaintiff; the reason Mrs. Acosta did not make a will was that she was superstitious and believed that if she wrote a will she would die the next day; Mrs. Acosta stated many times that she would write a will later—that she was "not going to die now, anyway."

Plaintiff testified further that she lived in the same house with Mrs. Acosta from May, 1949, until October, 1951; during

that time plaintiff took care of Mrs. Acosta, took her to the doctor and the hospital, and kept house, cooked, washed and ironed for her; after an operation for goiter was performed on Mrs. Acosta in 1951, she was not able to do much; plaintiff fed her, helped her bathe, dress, and move about; plaintiff's husband separated from plaintiff by reason of the constant care and attention plaintiff gave Mrs. Acosta; subsequently they were divorced; in October, 1951, plaintiff moved to another house; she went to Mrs. Acosta's home every day and took care of her and did the housework; in February, 1952, at the request of Mrs. Acosta, plaintiff moved to the house at 207 South Centre Street; plaintiff plastered the bedroom and painted the house; in 1952 Mr. Acosta was afflicted with cancer, was bedridden for the last two months he lived, and required constant care; plaintiff took care of him every day during his illness; Mr. Acosta died in March, 1952; thereafter Mrs. Acosta lived at plaintiff's home until September 1, 1952, when Mrs. Acosta moved back to the house at 311 West Second Street; she remained there until the middle of December, 1952, when she went to the home of her brother, defendant Morales; after the death of Mr. Acosta and until Mrs. Acosta went to the home of her brother, plaintiff took care of Mrs. Acosta and cooked, washed and ironed for her; before Mrs. Acosta went to the home of her brother, plaintiff's mother was ill and Mrs. Acosta said that she would go to the home of her brother until plaintiff's mother recovered; plaintiff went to the brother's home almost every day after Mrs. Acosta was there and ran errands for Mrs. Acosta; after plaintiff's mother recovered, arrangements were made for Mrs. Acosta to return on May 30, 1953, to live with plaintiff; Mrs. Acosta died at the home of her brother on May 8, 1953; Mrs. Acosta had sclerosis of the heart and dropsy during the time plaintiff took care of her.

Plaintiff testified further that Mrs. Acosta wanted plaintiff to be with her constantly; plaintiff discontinued many activities in order to take care of Mrs. Acosta; some of the activities which she discontinued were: attending church, attending picture shows, visiting and entertaining friends, bowling, and dancing; plaintiff was not paid for any of the services she performed for Mr. and Mrs. Acosta.

On cross-examination, plaintiff testified Mrs. Acosta was her second cousin, but plaintiff always called her "Aunt Maria"; plaintiff never asked Mrs. Acosta to make a will

or deed giving the property to plaintiff; she had Mrs. Acosta's word and that was enough.

Mrs. Aranda, called as a witness by plaintiff, testified that she and Mrs. Acosta were neighbors for 20 years; in 1948 she wrote two letters for Mrs. Acosta to plaintiff who was in Mexico; she did not make copies of the letters; Mrs. Acosta requested her to tell plaintiff to come home because Mrs. Acosta was very sick; Mrs. Acosta wanted plaintiff to stay with her until she died; Mrs. Acosta said that the reason she wanted her to write the letters was that Mrs. Acosta loved plaintiff like a daughter and Mrs. Acosta was always like a mother to plaintiff; Mrs. Acosta told Mrs. Aranda on two or three occasions that the house on the corner (207 South Centre Street) was for plaintiff when Mrs. Acosta died; she (witness) heard Mr. Acosta state that he was going to give the house (207 South Centre Street) to plaintiff.

Mrs. Pereria, called as a witness by plaintiff, testified that she lived in the house located at 207 South Centre Street for five years; in February, 1952, Mrs. Acosta requested her to move; Mrs. Acosta stated that the reasons she wanted Mrs. Pereria to move were that Mrs. Acosta was sick and she wanted her niece (plaintiff) to move there so that plaintiff could take care of Mrs. Acosta, and Mrs. Acosta wanted plaintiff to have the house when Mrs. Acosta died.

It was stipulated that if Dr. Lehman were called as a witness he would testify that he attended Mrs. Acosta for two and one-half years; during that time he saw her two or three times a week; plaintiff brought Mrs. Acosta to his office each time she required treatment; plaintiff was present each time he called on Mrs. Acosta; plaintiff did all the work that a nurse would do; plaintiff attended to the needs of Mr. and Mrs. Acosta.

At the close of plaintiff's case, defendants made a motion to dismiss the action on the ground that plaintiff had failed to show that she did not have an adequate remedy at law. The motion was denied.

Defendant Morales testified that he lived approximately 12 blocks from Mrs. Acosta's home; Mrs. Acosta was not well in 1949; he saw plaintiff at Mrs. Acosta's home from 1949 until the time Mrs. Acosta came to his home; plaintiff was not at Mrs. Acosta's home from 7 a. m. until evening, from 1949 until Mrs. Acosta came to live with him; for two or three months in 1951 or 1952 he took care of Mr. and Mrs. Acosta at night; Mrs. Acosta was not very sick;

plaintiff, and friends who came with her, took care of Mrs. Acosta in the daytime during those two or three months; plaintiff came to his house three or four times to see Mrs. Acosta; he heard conversations between plaintiff and Mrs. Acosta on those occasions; one of the conversations pertained to a check that plaintiff brought to Mrs. Acosta; Mrs. Acosta gave plaintiff $20; he also heard a conversation between Mrs. Acosta and plaintiff two days before Mrs. Acosta died, and plaintiff wanted Mrs. Acosta to make a will; Mrs. Acosta told plaintiff "that she was not making any, that she was to leave things as they were."

It was stipulated that if Josefina Morales (wife of Augustin) were called to testify her testimony would be substantially the same as that of Mr. Morales regarding Mrs. Acosta's condition and the conversations in the home of Mr. and Mrs. Morales.

Findings of fact and conclusions of law were waived.

Judgment was that the oral contract of May 1, 1950, whereby Maria M. Acosta agreed to make a will devising to plaintiff the property known as 207 South Centre Street (also legal description) was established and was in full force and effect; that the contract be specifically enforced; that defendant, as administrator of the estate of decedent and as sole beneficiary of the estate, holds said property in trust for plaintiff; and that said property be conveyed to plaintiff by said trustee.

Section 1624 of the Civil Code (statute of frauds) provides: "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: . . . 6. . . . an agreement to devise or bequeath any property, or to make any provision for any person by will. 7. . . ." A similar provision is in section 1973, subdivision 6, of the Code of Civil Procedure.

A question in the present case is whether the plaintiff has pleaded and proved facts sufficient to take the oral contracts out of the statute of frauds. The rule, and the reason for the rule, that under some circumstances principles of equity will remove a contract from the operation of those sections (statute of frauds) are stated in *Walker* v. *Calloway*, 99 Cal.App.2d 675 [222 P.2d 455]. ▪ On page 678 of that case is stated: "[T]he mere rendition of services is not usually such a part performance of a verbal agreement as will relieve the contract from the operation of the statute,

but 'if the services are of such a peculiar character that it is impossible to estimate their value by any pecuniary standard, and it is evident that the parties did not intend to measure them by any such standard, and if the plaintiff, after the performance of the services, could not be restored to the situation in which he was before the rendition of the services, it is such a part performance of the verbal agreement as will remove the contract from the rule, and equity, where other objections are not present, will decree specific performance. But in such cases the reason for the interposition of equity is quite obvious. Plaintiff has rendered services of extraordinary and exceptional character, such service as in contemplation of the parties was not to be compensated for in money, and, as in contemplation of law, cannot be compensated for in money; therefore, by no action at law could a plaintiff be restored to his original position. It would be in the nature of a fraud upon him to deny him any relief, and, the law failing by reason of its universality, equity, to promote justice, makes good its imperfections. [Citations.]' ''
The amended complaint in the present case stated a cause of action. It is not an example to be followed, however, in preparing a complaint.

As above stated, findings were waived. All intendments are in favor of the judgment.

■ There was evidence that, prior to making the contract, plaintiff had lived with Mr. and Mrs. Acosta in their home, about seven years (from 1934 to 1941 when plaintiff moved to Mexico), and Mrs. Acosta was like a mother to plaintiff and loved plaintiff as if plaintiff were her daughter; that Mrs. Acosta did not want anyone else to take care of her for the reason plaintiff had lived with her and knew her very well, and Mr. and Mrs. Acosta loved her as if she were their own daughter. There was evidence that Mrs. Acosta wrote letters to plaintiff in Mexico, stating that she was sick and needed plaintiff, and asking plaintiff to come from Mexico to be with her and take care of her; after plaintiff had come from Mexico for a visit, Mr. and Mrs. Acosta begged her not to return to Mexico, stating that she should heed them, they had no one else to turn to, and it was her duty and she should not leave. It thus appears, from letters and statements of Mrs. Acosta, that a relationship similar to a close family relationship existed between Mrs. Acosta and plaintiff, and that Mrs. Acosta needed and wanted the services, companionship, love and affection of plaintiff only.

The trial judge could have inferred from the evidence just referred to that Mrs. Acosta contemplated that the services rendered by plaintiff were exceptional and could not be rendered by any other person. Also, the judge could have inferred that the services rendered by plaintiff were of such exceptional, extraordinary, and peculiar character that they could not be, and in contemplation of the parties were not to be, compensated for in money. Plaintiff was not paid for her services. ▓▓ In *Monarco* v. *Lo Greco*, 35 Cal.2d 621 [220 P.2d 737], it was said at page 626: "It is settled that neither the remedy of an action at law for damages for breach of contract nor the quasi-contractual remedy for the value of services rendered is adequate for the breach of contract to leave property by will in exchange for services of a peculiar nature involving the assumption or continuation of a *close family relationship*." (Italics added.)

▓▓ There was evidence that plaintiff changed her position very materially by reason of the contract. She did not return to Mexico where she had resided about eight years, where she had an established English-Spanish academy, and where her husband was residing. She discontinued her academy and teaching in Mexico, and she made her home with Mrs. Acosta. She brought her husband from Mexico. She gave up many of her activities such as attending church and shows, and visiting and entertaining friends. She performed difficult and confining duties, pursuant to the contract, for approximately three and one-half years. The judge could have inferred that she could not be restored to the situation she was in before the contract was made.

The evidence was sufficient to support the judgment.

▓▓ Appellants contend further that the action is barred by provisions of section 714 of the Probate Code. That section states the time within which an action upon a creditor's claim must be commenced. The present action is not upon a creditor's claim. It is an action for equitable relief. Said section is not applicable herein.

▓▓ Appellants contend further that the court erred in permitting plaintiff to testify as to conversations she had with decedent. They argue that such testimony was not admissible under section 1880 of the Code of Civil Procedure. That section provides: "The following persons cannot be witnesses: . . . 3. Parties . . . to an action . . . against an executor or administrator upon a claim, or demand against the estate of a deceased person, as to any matter or fact.

occurring before the death of such deceased person." This is not an action upon a claim or demand against the estate. Said section is not applicable herein.

Appellants contend in effect that allegations in the original complaint that plaintiff had filed a claim against the estate for $4,200 as the reasonable value of plaintiff's services, and that the claim was disallowed, were destructive of "the cause of action"; that the plaintiff could not cure the defect by omitting such allegations from the amended complaint without explanation.

The original complaint stated, in the caption, that it was for specific performance of an agreement to leave property to plaintiff by will in exchange for services. The allegations therein with reference to making and performing the oral contracts were substantially the same as the allegations in the amended complaint. It was also alleged in the original complaint that plaintiff acted as housekeeper and practical nurse for decedent, and looked after her comfort and general welfare; $4,200 was the reasonable value of her services; plaintiff had filed a claim against the estate for $4,200 for services; and the claim had been disallowed. The original complaint did not contain allegations with reference to: the relationship between plaintiff and decedent; love and affection; changing of plaintiff's position to her detriment; and exceptional character of her services. The prayer of the original complaint was for "distribution" of $4,200 to plaintiff.

Appellants argue that the original complaint alleged a cause of action for the reasonable value of plaintiff's services; that the plaintiff attempted therein to disguise the nature of her action by using language that suggested an equitable cause of action for specific performance; that, in the amended complaint, plaintiff omitted her former allegations regarding her claim and the reasonable value of her services, and alleged therein additional facts in an attempt to state a cause of action for specific performance; and that plaintiff is bound by her former allegations regarding the value of her services. It seems to be appellants' contention that plaintiff's former allegation stating the money value of her services was a conclusive refutation of her subsequent allegation that the value could not be estimated in money. Plaintiff was not precluded by her former allegation from alleging that the services were of exceptional character and could not be estimated in money. The inconsistency of the allegations could

be considered in determining the fact as to whether the services were of exceptional character, but the first allegation was not conclusive. Whether or not the services were of exceptional character and could not be estimated in money was a question of fact for the trial judge.

By reason of the above conclusions, it is not necessary to determine other contentions on appeal.

The judgment is affirmed. The purported appeal from the order denying the motion for a new trial is dismissed.

Vallée, J., concurred.

Shinn, P. J., concurred in the judgment.