[Civ. No. 9437.   Third Dist.   Mar. 12, 1959.]

MARY WARD, Respondent, v. DALTON C. WRIXON, Appellant.

W. I. Follett for Appellant.

Horace E. Dunning for Respondent.

SCHOTTKY, J.—Respondent above named commenced an action against defendant praying judgment that it be decreed she was entitled to a life estate in certain real property. The amended complaint alleged in substance that on or about February 14, 1953, Perry A. Snideman verbally agreed with Mary Ward, respondent, that if she lived with him until his death, rendered to him services as a housekeeper, and contributed her pension of $59 a month, he would, in the event he predeceased her, give her a life estate in a two-story apartment-residence in Sacramento, California, together with the rents and profits therefrom; that Mary Ward relied on the promise of Snideman, performed all the agreed stipulations, and continued the relationship until Snideman's death on December 17, 1955; that Snideman assured Mary Ward and falsely represented to her that he had effected the transfer of a life estate to her; that Snideman, on March 11, 1955, transferred the property in question into joint tenancy with Dalton Clarence Wrixon, appellant. The complaint alleged

that no property or estate of Snideman's of any appreciable value remained at the time of his death.

Appellant in his answer denied the material allegations of the complaint and also pleaded the statute of frauds.

Upon the conclusion of the trial, the trial court found that the agreement existed; that respondent performed her part of the agreement in reliance upon decedent's promise to convey the promised life estate; that the services rendered were not measurable by pecuniary standards and were not intended to be so measured; that decedent violated his oral agreement by transferring the property in joint tenancy with appellant; that respondent never received any compensation for her services; that decedent assured respondent he had arranged his affairs in accordance with the verbal agreement, and respondent relied upon this assurance. It was further found that respondent was without adequate remedy at law and that unconscionable injury would result to respondent and unjust enrichment would result to appellant unless decedent's oral promise was enforced.

The court concluded that appellant was estopped to assert the statute of frauds, that respondent was entitled to a life estate in the property so long as she remains single, and that she receive the rents and profits therefrom.

Judgment was entered in accordance with said findings and this appeal is from said judgment.

The record shows that respondent was 65 years old at the time of the alleged oral agreement. She was not acquainted with the decedent until the day the agreement was first discussed. The decedent, then approximately 75 years of age, told respondent, "I will give you a home the rest of your life. This will be your home as long as you live, but I won't pay no wages but I will see you will have a home for the rest of your life if you make agreement on this." Respondent then stayed all night, and in the morning they got up and respondent got breakfast. Decedent told respondent, "Now, you think this over. I will get in touch with this other lady, and I will let you know." Nine or ten days later decedent called respondent over to his house and told her, "I guess you have a job. . . . [A]s long as I got you to keep house, why this will be your home. The basement is rented now. I am getting $45.00 a month for it. You keep that and rent it. That is your pay for all utilities. You collect the rent, you pay all the utilities and whatever repairs has to be done on the house, and then anywheres reasonable will be yours. We will have

to pay it out of that rent money, and the balance goes in the bank, but after you are gone the home belongs to my stepson and stepdaughter which isn't more than right because their mother helped me to make it."

On March 1, 1953, or thereabouts, Snideman sold his Sacramento business and suggested moving to the country, and Mrs. Ward expressed a desire to go with him. She accompanied Snideman in his search for a suitable building site until River Pines was decided upon.

The new home site was unimproved and Mrs. Ward assisted Snideman in clearing it. She then assisted Snideman and a carpenter in the erection of a garage on the premises. She helped erect a rock wall on the homesite.

They lived in a neighbor's bunkhouse, and Mrs. Ward cooked their meals in the garage which had been built on the homesite. Then Mrs. Ward assisted in the construction of the home at River Pines by driving nails, laying the floor, "oiling and stuff on the porch that had to be for the casing and all that there, and I done all the painting, and papered and put linoleum tile in around the kitchen and the bathroom, and I done all that, and we laid the linoleum in the kitchen."

In constructing the rock wall she used two spades, ". . . I was pulling on and he had a big crowbar and he was pushing on and I was guiding." She helped haul dirt and helped level off the yard. Mrs. Ward worked from 7 a. m. until dark when constructing the home, and she cooked all the meals in the garage on an electric plate until the home was completed the 1st of July, 1953.

During the first year at River Pines, Mrs. Ward "helped clean up, fix up, painting and one thing inside, and I done a lot of canning. I canned over 500 quarts of fruit and things that he bought. He was a very good provider." In addition, Mrs. Ward did ". . . all the cooking and all the washing, and kept the house up. I took care of him. I shaved him and trimmed his hair up. He didn't want to go to any barber, . . ."

Snideman never paid Mrs. Ward for any of her services, and she never expected any pay on account of the agreement that she would receive no wage "but he would see that home was mine in Sacramento as long as I lived, but after I was gone it would go to his step children." Mrs. Ward continued to live at River Pines throughout 1953 and 1954.

Most of the conversation about the arrangement with Snideman was had in Sacramento. After coming to River Pines,

the only thing he said was, "You have your home in Sacramento. Anything happens to me you move back to Sacramento." She discussed with decedent the fact that she should have "something in writing" when the agreement was first made, but "he said his word is good. I said, 'That is true, your word might be good, if anything happens I wouldn't have anything to show for it.' He said, 'My stepson is honest. You don't have to worry about him.'"

In February of 1954, Snideman's health began to fail and respondent had more work to do in caring for him. On October 15, 1955, at a time when Mrs. Ward became concerned because Snideman refused to take his heart medicine, and inquired of him what she was going to do if anything happened to him, he said, "You have nothing to worry about. You have your home in Sacramento there. Everything is taken care of." He said, "You have nothing to worry about. I don't know what you are worrying about."

Snideman was taken to the hospital in Sacramento on the 26th of November, 1955, and except for the time spent by Mrs. Ward taking care of the domestic duties up at River Pines, she was with Snideman "every day from early morning to late in the evening every day from that time until he passed away."

In the deposition of John T. Snideman, decedent's brother, it was disclosed that at River Pines in October of 1955, Perry Snideman stated that "Mary is provided for the rest of her days, providing she stays single, in the home at Sacramento on 'J' or 'I' Street." "There is papers in my lock box, a will to that effect. It is locked up. And when the right time comes, why it is all there." John Snideman stated that decedent had told him what kind of work Mrs. Ward was doing for decedent, namely, "Housekeeper and taking care of him and working like a horse helping build the house and place."

Cross-examination of appellant disclosed that Mrs. Ward was treated "as one of the family;" that his stepfather, decedent, was very fond of her, and that he himself, "thought very much of her," and that "We all liked Mary, took quite a liking to her."

Appellant was a tenant of the safe deposit box decedent had at the Bank of America at Twelfth and K Streets, Sacramento. Both the River Pines property and the Eye Street property are in joint tenancy and do not include Mary Ward as a tenant. The only other property owned by decedent at the time of his death was the automobile (a 1952 Chevrolet, the

pink slip to which had theretofore been signed over to appellant), four rooms of furniture at the River Pines house (excepting a "nominal amount" of this furniture claimed by Mrs. Ward). Appellant testified the only estate of decedent he had accumulated since decedent's death had been the two houses (held in joint tenancy), the automobile, a ring and a wrist watch.

In support of his contention that the evidence does not support the findings and judgment, appellant relies strongly on several cases.

The first is *Murdock* v. *Swanson*, 85 Cal.App.2d 380 [193 P.2d 81], in which a demurrer to the complaint was sustained. The first cause of action alleged that in September, 1941, the plaintiff and the decedent, who was then 74 years of age, entered into an oral agreement whereby it was agreed that the plaintiff would care for the decedent, render personal services to her and furnish her with certain goods during the remainder of her lifetime; that she would assist her in caring for her property to the extent that might be necessary to preserve the property and prevent its sale; and that, if necessary, she would care for the decedent in her own home or in plaintiff's home to the end that she should not be sent to an institution. It was further alleged that in consideration of all these things the decedent agreed to make and leave at her death a will leaving her ranch and all her other real and personal property to the plaintiff; and that, in making this agreement, both parties understood and agreed that the things to be done by the plaintiff would not be susceptible of pecuniary compensation and that it would be impossible to compensate plaintiff except in the manner agreed upon.

It was also alleged that in September, 1941, the plaintiff commenced to fulfill her part of this agreement; that she made trips from her home to the home of decedent, a distance of many miles, on the average of twice a day; that she performed various personal services for the decedent and worked on her ranch; that she furnished laborers from time to time to construct fences and do other work on the ranch; that she furnished decedent with food, clothing, drugs and medicine and other articles, including a milk cow and other animals for her ranch; that she acted as sole companion to the decedent; and that these various services continued until the decedent died. It was further alleged that plaintiff gave up a business because it became necessary to spend so much time

with the decedent in order to comply with the agreement. It was also alleged that she neglected many of her marital duties because of carrying out the agreement, and that she did not receive any compensation for the services. She asked for specific performance of the oral agreement. In affirming the judgment, the court said at page 385:

"There is no merit in the further contention that the services rendered by the appellant were not susceptible of pecuniary compensation and that, as alleged, this situation was recognized and agreed upon by the parties to the oral agreement. The allegation to that effect is merely a conclusion and the facts alleged clearly show that they were all personal services and articles furnished, and that they are not of so extraordinary or exceptional character 'as in contemplation of law, cannot be compensated for in money.' "

Also cited by appellant is *Tompkins* v. *Hoge,* 114 Cal. App.2d 257 [250 P.2d 174], in which one of the grounds of decision was that equity denies relief when the services are compensable in damages or in quantum meruit. In reversing a judgment in favor of plaintiff the court said at page 265:

". . . Plaintiff here alleged she gave up a salary of $2,500 per year and that she could have retired as a school teacher upon a pension of about $50 per month when she had attained the age of 70 years, or in 1947, and that defendant was aware of that fact. The detriment suffered by plaintiff in resigning her position, with respect both to loss of salary and pension rights, would have been proper elements of damage in an action to recover for the value of plaintiff's services. The fact that plaintiff gave up association with friends and relatives in New York was comparable to the neglect of marital, social and household duties and absence from her home and husband, alleged by the plaintiff in the Murdock case. There was no finding that by reason of the facts found plaintiff suffered detriment in coming into the home of defendant that could not be compensated for in money. We think such a finding would have had no basis in the evidence. Anyone who goes into the home of another, there to reside permanently, gives up associations and ways of life for others that may turn out to be less desirable. Inability to be restored to the former status is not a good ground for equitable relief unless to deny it would operate as a fraud upon the party seeking relief. This is not such a case and was not considered by the trial court to be one. Such detriment as plaintiff suffered was compensable in damages and her claim therefor was one to be

prosecuted at law and not in equity. (See *Zaring* v. *Brown, supra,* 41 Cal.App.2d 227 [106 P.2d 224].)''

Also cited by appellant is *Chahon* v. *Schneider,* 117 Cal. App.2d 334 [256 P.2d 54], which was an action for quasi-specific performance of an oral contract to transfer property by will. Defendant's demurrer to the complaint was sustained and plaintiff appealed from the judgment entered. Plaintiff alleged in her complaint that (1) in 1943, she made an agreement with Marcelin Berge, then 60 years of age, to take him into her home and furnish him with board, room, and laundry, for $40 per month. In addition to caring for her nine-room home, taking care of Berge's personal needs and acting as housekeeper in his personal room, plaintiff worked in a laundry and returned from work each noon to prepare Berge's lunch. Berge continued payment of $40 per month and remained in plaintiff's home until July, 1947, when her husband died. Shortly after moving into her home, Berge became demanding, attempted to dictate the menu for guests of plaintiff and her husband, and resented intrusions in plaintiff's home which he came to consider his own.

(2) In 1946 Berge fractured his leg, was hospitalized for about six months, and submitted to extended bone grafts and surgery. He returned to plaintiff's home and went through an additional six months' period of convalescence. During this period plaintiff was required to furnish him with extensive nursing care in addition to room, board, and laundry. Because of the increased burden plaintiff and her husband desired to terminate the relationship, but did not do so, and agreed to continue the relationship, because Berge orally promised plaintiff that if she would continue to care for him until his death he would compensate her in his will, in that he would leave her a certain bank account, which then contained approximately $46,000, and would leave the remainder of his estate, consisting of two other bank accounts, to the defendant. Plaintiff agreed to permit Berge to remain and to care for him and render said services for him upon the terms proposed by him. In making this agreement the parties did not contemplate that the services appellant was to perform were to be compensated by the $40 monthly payments or other pecuniary compensation; that the services were so personal and unusual in character that the parties did not intend they should be compensated on a basis of any specific amount in monthly payments. Pursuant to the agreement, and in reliance upon Berge's promise, plaintiff performed the following

services until Berge died: washing, ironing, cooking of special foods, mending, sewing, cleaning and other household tasks; continued nursing care, including massaging his back and legs and helping him to walk about the house; doing all his personal errands outside the house; and taking him along on week-end trips.

(3) Upon the death of her husband in 1947, it was no longer necessary for plaintiff to maintain such a large home and she desired to give up working in the laundry, sell her home and enjoy a more complete social life than was possible while continually remaining at home caring for decedent. For these reasons, in the fall of 1948, she advised decedent he would have to find other quarters. Decedent repeated his promise to will her the bank account, urged her not to sell, and requested her to continue caring for him. In reliance upon these promises appellant was induced to continue caring for decedent until his death, in spite of the fact that his demands increased, in that he refused to give appellant messages left by her friends, discouraged her friends from calling at the house, and attempted to dominate her social and business affairs.

(4) Berge was again hospitalized April 13, 1950, and while at the hospital made a will bequeathing $1,000 to plaintiff and giving all the residue of his assets to the defendant. He died January 19, 1951, without changing that will or making a new one.

In affirming the judgment the court said at page 339:

"It does not appear to us that plaintiff made such a change of position or that the services she rendered were so peculiar that she could not be compensated in terms of money. Recognition of the invalidity of the contract and consequent denial of enforcement of its provisions, would neither unconscionably injure the plaintiff nor unjustly enrich the decedent, his estate, or his legatee, were plaintiff to pursue her legal remedy of recovering from the estate the reasonable value of her services, less such amount as may already have been paid her.

"The facts of our case are quite like those in *Jirschik* v. *Farmers & Merch. Nat. Bank*, 107 Cal.App.2d 405 [237 P.2d 49], in which a demurrer to a similar complaint was sustained. There the plaintiff rendered services as a housekeeper and nurse for a person who orally promised to will her $15,000. Said the reviewing court: 'In this case the most that can be drawn from plaintiff's complaint is that while she was employed and paid by decedent she could have secured work

at a higher rate of pay, with certain social security and unemployment benefits; and that, relying upon decedent's promise to leave her $15,000 in his will—which promise he did not keep—she stayed with him, did not earn additional money in defense work, and did not secure the social benefits mentioned.

" 'This does not show unconscionable injury sufficient to estop defendants from interposing the bar of the statute of frauds. Nor does it show unjust enrichment of decedent.

" 'The complaint does not allege that plaintiff was paid less than the reasonable value of her services. And if the wages paid plaintiff had been less than they were reasonably worth, an action in quantum meruit for the difference would prevent any unjust enrichment of decedent, or of his estate. (*Monarco* v. *Lo Greco, supra*; *Ruinello* v. *Murray, supra* [36 Cal.2d 687 (227 P.2d 251)].)' (Pp. 406-407. A petition for a hearing by the Supreme Court was denied.)"

Respondent in reply relies upon several cases which she contends support the judgment. The principal one is *Monarco* v. *Lo Greco*, 35 Cal.2d 621 [220 P.2d 737]. The facts of that case as stated in the opinion are as follows:

"Natale and Carmela Castiglia were married in 1919 in Colorado. Carmela had three children, John, Rosie and Christie, by a previous marriage. Rosie was married to Nick Norcia. Natale had one grandchild, plaintiff Carmen Monarco, the son of a deceased daughter by a previous marriage. Natale and Carmela moved to California where they invested their assets, amounting to approximately $4,000, in a half interest in agricultural property. Rosie and Nick Norcia acquired the other half interest. Christie, then in his early teens, moved with the family to California. Plaintiff remained in Colorado. In 1926, Christie, then 18 years old, decided to leave the home of his mother and stepfather and seek an independent living. Natale and Carmela, however, wanted him to stay with them and participate in the family venture. They made an oral proposal to Christie that if he stayed home and worked they would keep their property in joint tenancy so that it would pass to the survivor who would leave it to Christie by will except for small devises to John and Rosie. In performance of this agreement Christie remained home and worked diligently in the family venture. He gave up any opportunity for further education or any chance to accumulate property of his own. He received only his room and board and spending money. When he married and suggested the possibility of securing some present interest to support his wife, Natale told

him that his wife should move in with the family and that Christie need not worry, for he would receive all the property when Natale and Carmela died. Natale and Carmela placed all of their property in joint tenancy and in 1941 both executed wills leaving all their property to Christie with the exception of small devises to Rosie and John and $500 to plaintiff. Although these wills did not refer to the agreement, their terms were agreed upon by Christie, Natale and Carmela. The venture was successful, so that at the time of Natale's death his and Carmela's interest was worth approximately $100,000. Shortly before his death Natale became dissatisfied with the agreement and determined to leave his half of the joint property to his grandson, the plaintiff. Without informing Christie or Carmela he arranged the necessary conveyances to terminate the joint tenancies and executed a will leaving all of his property to plaintiff. This will was probated and the court entered its decree distributing the property to plaintiff. After the decree of distribution became final, plaintiff brought these actions for partition of the properties and an accounting. By cross-complaint Carmela asked that plaintiff be declared a constructive trustee of the property he received as a result of Natale's breach of his agreement to keep the property in joint tenancy. On the basis of the foregoing facts the trial court gave judgment for defendants and cross-complainant, and plaintiff has appealed.''

In affirming the judgment the court said at page 623:

''The controlling question is whether plaintiff is estopped from relying upon the statute of frauds (Civ. Code, § 1624; Code Civ. Proc., § 1973) to defeat the enforcement of the oral contract. The doctrine of estoppel to assert the statute of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances. Such fraud may inhere in the unconscionable injury that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract (citing cases), or in the unjust enrichment that would result if a party who has received the benefits of the other's performance were allowed to rely upon the statute. (Citing cases.) In many cases both elements are present. Thus not only may one party have so seriously changed his position in reliance upon, or in performance of, the contract that he would suffer an unconscionable injury if it were not enforced, but the other may have reaped the bene-

fits of the contract so that he would be unjustly enriched if he could escape its obligations. (Citing cases.)

"In this case both elements are present. In reliance on Natale's repeated assurances that he would receive the property when Natale and Carmela died, Christie gave up any opportunity to accumulate property of his own and devoted his life to making the family venture a success. That he would be seriously prejudiced by a refusal to enforce the contract is made clear by a comparison of his position with that of Rosie and Nick Norcia. Because the Norcias were able to make a small investment when the family venture was started, their interest, now worth approximately $100,000 has been protected. Christie, on the other hand, forbore from demanding any present interest in the venture in exchange for his labors on the assurance that Natale's and Carmela's interest would pass to him on their death. Had he invested money instead of labor in the venture on the same oral understanding, a resulting trust would have arisen in his favor. (*Byers* v. *Doheny*, 105 Cal.App. 484, 493-495 [287 P. 988]; see Rest., Trusts, § 454, comment J., illus. 12.) His 20 years of labor should have equal effect. On the other hand, Natale reaped the benefits of the contract. He and his devisees would be unjustly enriched if the statute of frauds could be invoked to relieve him from performance of his own obligations thereunder.

"It is contended, however, that an estoppel to plead the statute of frauds can only arise when there have been representations with respect to the requirements of the statute indicating that a writing is not necessary or will be executed or that the statute will not be relied upon as a defense. This element was present in the leading case of *Seymour* v. *Oelrichs*, 156 Cal. 782 [106 P. 88, 134 Am.St.Rep. 154], and it is not surprising therefore that it has been listed as a requirement of an estoppel in later cases that have held on their facts that there was or was not an estoppel. (See, e.g., *Zellner* v. *Wassman*, 184 Cal. 80, 87 [193 P. 84]; *Smith* v. *Bliss*, 44 Cal.App. 2d 171, 175 [112 P.2d 30]; *Standing* v. *Morosco*, 43 Cal.App. 244, 246 [184 P. 954].) Those cases, however, that have refused to find an estoppel have been cases where the court found either that no unconscionable injury would result from refusing to enforce the oral contract (*Zellner* v. *Wassman*, 184 Cal. 80, 87 [193 P. 84]; *Smith* v. *Bliss*, 44 Cal.App.2d 171, 178 [112 P.2d 30]; *Little* v. *Union Oil Co.*, 73 Cal.App. 612, 621-622 [238 P. 1066]; *Standing* v. *Morosco*, 43 Cal.App. 244,

247, 248 [184 P. 954]), or that the remedy of quantum meruit for services rendered was adequate. (*Murdock* v. *Swanson*, 85 Cal.App.2d 380, 385 [193 P.2d 81]; *De Mattos* v. *McGovern*, 25 Cal.App.2d 429, 432 [77 P.2d 522]; *cf. Morrison* v. *Land*, 169 Cal. 580, 586 [147 P. 259].) In those cases, however, where either an unconscionable injury or unjust enrichment would result from refusal to enforce the contract, the doctrine of estoppel has been applied whether or not plaintiff relied upon representations going to the requirements of the statute itself. . . ."

Respondent also relies heavily on *De Hermosillo* v. *Morales*, 146 Cal.App.2d 819 [304 P.2d 854], as containing appropriate principles of law applicable to the factual situation in the instant case. The action in the De Hermosillo case was an action for ''quasi-specific'' performance of oral agreements to make a will devising property as compensation for services rendered, and to establish a trust in the property. The facts of the De Hermosillo case indicate that plaintiff was induced by decedent to come from Mexico to live with decedent and take care of her for the reason that decedent was sick and needed plaintiff; that a relationship similar to a close family relationship existed between decedent and plaintiff, and that decedent needed and wanted the services, companionship, love and affection of plaintiff only. (P. 828.) There was evidence that plaintiff took decedent to the doctor and the hospital, and kept house, cooked, washed and ironed for her; after an operation for goiter was performed on decedent in 1951, decedent was not able to do much; plaintiff fed her, helped her bathe, dress, and move about; in October, 1951, plaintiff moved to another house; she went to decedent's house every day and took care of her and did the housework; plaintiff plastered the bedroom and painted the house; in 1952 decedent's husband was afflicted with cancer, was bedridden for the last two months he lived, and required constant care; plaintiff took care of him every day during his illness; decedent had sclerosis of the heart and dropsy during the time plaintiff took care of her. There was abundant evidence of other acts of a similar nature performed by plaintiff during the lifetime of the decedent in reliance on her oral promise to devise certain real property to plaintiff. (Pp. 821, 824-825.)

In affirming a judgment in favor of plaintiff the court said: ''. . . The trial judge could have inferred from the evidence just referred to that Mrs. Acosta contemplated that the services rendered by plaintiff were exceptional and could not be

rendered by any other person. Also, the judge could have inferred that the services rendered by plaintiff were of such exceptional, extraordinary, and peculiar character that they would not be, and in contemplation of the parties were not to be, compensated for in money. Plaintiff was not paid for her services. In *Monarco* v. *Lo Greco*, 35 Cal.2d 621 [220 P.2d 737], it was said at page 626: 'It is settled that neither the remedy of an action at law for damages for breach of contract nor the quasi-contractual remedy for the value of services rendered is adequate for the breach of contract to leave property by will in exchange for services of a peculiar nature involving the assumption or continuation of a *close family relationship.*' (Italics added.)''

Since the contract in the instant case was oral, it was necessary for Mary Ward to prove and plead facts which would give rise to an estoppel for otherwise the contract is barred by the statute of frauds. (Civ. Code, § 1624; Code Civ. Proc., § 1973.) ■ The doctrine of estoppel has been applied by the courts of this state to prevent unconscionable injury that would result from refusal to enforce the oral contract in situations where one party has been induced to change his position seriously in reliance on the contract or in the unjust enrichment that would result if the contract were not enforced. (*Monarco* v. *Lo Greco, supra.*) ■ Where no unconscionable injury exists or where the remedy of quantum meruit for services rendered is adequate the courts will not find an estoppel. (*Monarco* v. *Lo Greco, supra.*) ■ Whether or not the elements of estoppel exist depends on the particular factual context. (*Jirschik* v. *Farmers & Merch. Nat. Bank,* 107 Cal.App.2d 405 [237 P.2d 49].) ■ The mere rendition of personal services is not sufficient to take a contract from the operation of the statute of frauds in an action for quasi-specific performance unless the services are of such peculiar, extraordinary, or exceptional character that it is impossible to estimate their value in money. (*Palmer* v. *Phillips,* 123 Cal.App.2d 291 [266 P.2d 850].) ■ The question then becomes whether the facts proved are sufficient in the instant case for the court to have found that an estoppel existed. Basically Mary Ward gave up her home in Sacramento with her son to enter Perry Snideman's home. This is not such an abandonment of old ties as would seem to be sufficient. She performed household services. This too would not be enough. She offered him companionship. In some cases this has been an influencing factor. She assisted in the construction of the

River Pines home. The closest case to this is the allegation in the Palmer case where it was alleged that plaintiff worked on her ranch. In that case the nature of the work performed was not alleged. It may not have been of such a nature that it would have increased the value of the ranch. In the instant case it is clear that Mary Ward did heavy construction work in assisting in the construction of the home in River Pines. While it might be said that her labor could be compensable in money, the services performed in the construction of the home were such that they undoubtedly enriched the estate. She also acted as a companion to the decedent. It is evident that their relationship was more than that of master and servant. She entertained the decedent's friends. The evidence discloses that she performed personal services far beyond those which are normally performed by a servant. She cared for his person, gave constant attention to his physical needs, and gave him comfort and solace. It is evident that the relationship was that of devoted friends. It is also of importance that she did not receive any compensation for all the things that she did. We think that the facts collectively were sufficient to warrant the trial court finding, as it did, that the services performed were of an extraordinary or exceptional nature, that they enriched the decedent's estate, and that they were not compensable in money. These findings are sufficient to support the judgment. (*Monarco* v. *Lo Greco, supra.*) We believe that the conclusion of the trial court as expressed in its memorandum opinion, and hereinafter quoted, is fully supported by the evidence and by principles of equity:

"It seems clear to the Court and the Court concludes that the plaintiff, under an agreement with decedent Perry Snideman, rendered services to him and, indeed, to members of his family of such character and to such extent that it is impossible to estimate the value of said services by a pecuniary standard and it is evident that the parties did not intend that they should be measured by such standard. The services so rendered included, but were not limited to, the care of decedent's home by plaintiff, the care of his person, both in dire illness and in health, constant attention to his physical needs and the constant rendition of comfort, solace, and companionship. She labored strenuously with decedent in the construction of a home at River Pines and lived there with [him] during the construction period, and thereafter, under adverse conditions. *The Court is satisfied that decedent agreed with plaintiff that if she would render such services during his*

*lifetime she, in consideration thereof, would be given the use of the property situated in Sacramento and described in the complaint, during her lifetime, so long as she remained single and any proceeds from the rental of a portion of such property were to be by plaintiff devoted to the property itself, namely, the payment of taxes and necessary repairs and maintenance.* Unconscionable injury and unjust enrichment would result from a refusal to enforce such agreement. It is evident that plaintiff has never been compensated, even to the slightest degree, for her services, and it is also evident that she, at all times, acted in reliance on the assumption and assertions that arrangements had been completed to carry the agreement into effect. Defendant now would have her go her separate way uncompensated and unappreciated. Equity will not tolerate such a result.

"Decedent, on March 11, 1955, after plaintiff had been with him for over two years, did, in violation of his agreement, place the property in joint tenancy with defendant and also made joint tenancy disposition of the River Pines Property. Upon his death in December of 1955 he left no estate from which plaintiff can hope to recover. She is, therefore, without adequate remedy or any remedy at law." (Emphasis added.)

No other points raised require discussion.

The judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.

A petition for a rehearing was denied April 9, 1959, and appellant's petition for a hearing by the Supreme Court was denied May 6, 1959.